Amanda R. Grier
Colleen B. Robbins
Elsie B. Kappler
FEDERAL TRADE COMMISSION
(Each appearing pursuant to DUCivR83-1.1(e))
Attorneys for Plaintiff
Division of Marketing Practices
600 Pennsylvania Ave., N.W., CC-8528
Washington, DC 20580
Telephone: (202) 326-3745
agrier@ftc.gov
crobbins@ftc.gov
ekappler@ftc.gov

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>  Plaintiff,<br><br>  v.<br><br>ELITE IT PARTNERS, INC., a Utah corporation doing business as ELITE IT HOME, and<br><br>JAMES MICHAEL MARTINOS, individually and as an officer of ELITE IT PARTNERS, INC.,<br><br>  Defendants. | **Case No.** 2:19cv125<br><br>**FILED UNDER SEAL PURSUANT TO COURT ORDER (DOCKET NO. _____)**<br><br>**CERTIFICATION OF FTC COUNSEL AMANDA R. GRIER PURSUANT TO FED. R. CIV. P. 65(b) IN SUPPORT OF *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER AND *EX PARTE* MOTION TO TEMPORARILY SEAL THE DOCKETAND ENTIRE FILE** |

I, Amanda R. Grier, certify as follows:

1.  I am over twenty-one years of age and am a citizen of the United States. I am one

of the attorneys representing the Plaintiff Federal Trade Commission ("FTC") in the above-

captioned enforcement action against Elite IT Partners, Inc., dba Elite IT Home, and James Michael Martinos ("Defendants").

2. I am a member in good standing of the bars of Virginia and the District of Columbia. My business address is Federal Trade Commission, 600 Pennsylvania Ave., N.W., Mailstop CC-8528, Washington, DC 20580. Unless indicated otherwise, I have personal knowledge of the facts stated herein and if called as a witness, would competently testify thereto.

3. I submit this certification pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1746 in support of the FTC's *Ex Parte* Motion for a Temporary Restraining Order ("TRO Motion") and in support of the FTC's request that the Temporary Restraining Order ("TRO") be issued without notice to Defendants. I also submit this certification in support of the FTC's concurrently filed Motion to Temporarily Seal the Docket and Entire File ("Motion to Seal"). As required by DUCivR 5.2, this certification shows good cause for the FTC's request that the Court seal the docket and entire file in this matter temporarily.

4. Pursuant to Rule 65(b)(1), this Court may issue a TRO without notice to Defendants if:

> (A) specific facts in an affidavit…clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

5. For the reasons discussed below, the FTC has not provided Defendants with notice of the filing of this action, and requests that the Court issue the proposed *ex parte* TRO and seal the entire docket until: (1) all Defendants are served, or (2) 5:00 pm MST on March 5, 2019, whichever occurs earlier.

## DEFENDANTS' VIOLATIVE BUSINESS PRACTICES

6. The evidence set forth in the FTC's Complaint, TRO Motion and its accompanying four volumes of exhibits, including sworn declarations from consumers, former employees, a computer forensics expert, FTC investigators, Utah Division of Consumer Protection ("DCP"), and third party investigators, demonstrates that Defendants are engaged in a fraudulent tech support scheme that has victimized consumers throughout the United States. Defendants lure consumers through promises of free computer assistance and scare consumers into purchasing unnecessary computer technical support services based on Defendants' misleading representations that consumers' computers are in need of repair.

7. In perpetrating their scheme, Defendants have violated the FTC Act, 15 U.S.C. § 45(a), the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, as amended, and Section 4 of the Restore Online Shoppers' Confidence Act, 15 U.S.C. § 8403, by, among other things: (1) making misrepresentations to consumers about the state of their computers to induce them to purchase computer services; (2) making misrepresentations about their affiliations with well-known technology companies, like Yahoo; and (3) failing to disclose, prior to payment, that Defendants charge a $150 cancellation fee and that the monthly fee for the maintenance program is a one-year commitment with an automatic renewal at the end of one year.

8. To further the public interest, the FTC asks the Court to grant, *ex parte*, a TRO against Defendants, pursuant to F. R. Civ. P. 65. The TRO would immediately halt Defendants' scheme and ongoing law violations, prevent further consumer harm, and preserve the Court's ability to grant complete and permanent relief in this case, consistent with the Court's broad equitable powers. *FTC v. LoanPointe, LLC*, 525 F. App'x 696, 699 (10th Cir. 2013) ("[Section] 13(b)'s grant of authority to provide injunctive relief carries with it the full range of equitable

remedies…."); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 n.6 (10th Cir. 2005). Specifically, the FTC seeks an *ex parte* TRO that: (1) enjoins Defendants from making misrepresentations regarding consumers' computers and their affiliation with well-known technology companies; (2) enjoins Defendants from violating the TSR and ROSCA; (3) freezes Defendants' assets; (4) appoints a temporary receiver over the corporate Defendant; (5) grants Plaintiff access to the corporate Defendant's business premises and records; and (6) provides for expedited discovery. Further, to give the TRO full effect, the FTC requests that the Court grant an order sealing the docket and entire file in this matter temporarily, pursuant to DUCivR 5.2.

9. As described more fully in the TRO Motion and the accompanying exhibits, the evidence establishes that the FTC is likely to prevail on the merits of its action against Defendants, and Defendants will be liable for consumer injury resulting from their unlawful scheme. The Defendants have ample opportunity and motivation to easily conceal and dissipate assets and destroy important documents: (1) Defendants operate a pervasive, fraudulent enterprise dependent on misrepresentations; (2) the FTC is seeking monetary relief in the form of compensation to consumers; (3) Defendants' assets can be transferred, hidden, encumbered, or dissipated to avoid discovery; and (4) computer equipment, including the equipment Defendants use to run their business, can easily be wiped and business records destroyed. Furthermore, Defendants have persisted in their deceptive scheme despite an administrative proceeding by Utah's DCP and companion enforcement action by the Utah Attorney General's office relating to its failure to register as a telemarketer, a cease and desist letter from Oath (Yahoo's parent company) for fraudulently misrepresenting themselves as Yahoo employees, termination by its credit card payment processor for excessive credit card chargebacks, a steady stream of consumer complaints to customer service representatives as well as from the Better Business

Bureau and Utah DCP, and termination from Microsoft's Partner Network for fraudulent activity. These actions evince Defendants' willingness to run afoul of the law.

10. Consequently, there is good cause to believe that immediate and irreparable damage to the FTC's ability to obtain, and this Court's ability to craft, complete and effective final relief will occur if the FTC's present filings are not under seal or if, in any manner, Defendants receive advance notice of any aspect of this enforcement action. To my knowledge, Defendants are unaware of the FTC's application for a TRO.

11. In fulfilling its mandate to combat fraud in interstate commerce, the FTC has requested TROs in appropriate cases, including on an *ex parte* basis, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the District of Utah and other district courts within the Tenth Circuit have granted the FTC's requests. *See, e.g.*, *See FTC v. Peterson*, No. 4:18-cv-00049-DN (D. Utah July 10, 2018) (unpublished) (*ex parte* TRO with conduct prohibitions and asset freeze); *FTC v. Your Yellow Book, Inc.,* No. 5:14-cv-00786-D (W.D. Okla. July 25, 2014) (unpublished) (same); *FTC v. Apply Knowledge, LLC*, No. 2:14-cv-00088-DB (D. Utah Feb. 11, 2014) (unpublished) (same); *FTC v. Skybiz.com, Inc.*, No. 01-CV-396-K(E) (N.D. Okla. June 6, 2001) (unpublished) (same).

12. The FTC has not made Defendants aware of its undercover investigation into their business practices. As illustrated by the following examples, it has been the FTC's experience that defendants who engage in deceptive practices, and who receive notice of the filing of an action by the FTC, often attempt to undermine the FTC's efforts to preserve the status quo by immediately dissipating or concealing assets and/or destroying documents. Often defendants or their affiliates who have been served with a temporary restraining order attempt to remove assets from their financial institutions or conceal offshore assets. The examples in paragraphs thirteen (13) and fourteen (14) have been identified within the FTC as incidents in which defendants

acted in such a manner, and these are provided on information and belief to illustrate the FTC's previous experiences.

13. The following examples come from FTC actions where defendants, either not subject to an *ex parte* TRO or despite it, hid assets and destroyed documents, and illustrate the FTC's concern that the Defendants in this case would do the same.

   a. In *FTC and the State of Georgia v. Laptop and Desktop Repair, LLC*, Case No. 1:16-CV-3591-AT (N.D. Ga. 2016), the FTC sought and obtained an *ex parte* TRO with an asset freeze. After learning that the TRO had been granted, one defendant immediately withdrew money and transferred it to a non-defendant limited liability company. On the day that the court entered a preliminary injunction with an asset freeze, the same defendant withdrew $103,369 from his personal, online brokerage account and transferred the money to another personal account.

   b. In *FTC v. Dayton Family Productions, Inc.*, No. 97-00750 (D. Nev. 2013), the FTC obtained an *ex parte* TRO prohibiting defendants from destroying business records and granting the FTC immediate access to such records. The FTC served the TRO on the defendants' employees at a primary office and then discovered the existence of a second office. Upon arriving at the second location, the FTC learned that an employee served with the TRO that morning had already accessed a computer in that location. FTC forensic examiners confirmed that the computer's hard drive was erased in the hours after the employee received the TRO. The data from the hard drive was never recovered.

c. In *FTC v. E.M.A. Nationwide Inc.*, No. 12-cv-02394 (N.D. Ohio 2012), the court denied the FTC's request for an *ex parte* TRO with a corporate asset freeze. Within days, the defendants withdrew more than $152,000 from a bank account.

d. In *FTC v. Transcontinental Warranty, Inc.*, No. 09-2927 (N.D. Ill. 2009), the FTC moved for a TRO with notice to the defendants and the court issued it, freezing defendants' assets and appointing a receiver. However, when the receiver and counsel for the FTC arrived at the corporate defendants' premises pursuant to the court's order, hundreds of folders with labels indicating that they contained records of defendants' most recent transactions were found empty. In addition, five computers, including that of the corporate defendants' CFO, were missing— allegedly stolen the night before the arrival of the receiver and counsel for the FTC.

e. In *FTC v. Connelly*, No. 06-701 (C.D. Cal. 2006), the court, following notice to two of the three individual defendants, issued an *ex parte* TRO with an asset freeze against a third individual defendant. After receiving notice of the TRO, all three defendants withdrew a total of at least $800,000, some of which was subject to the asset freeze, and most of which was never recovered.

f. In *FTC v. Global Marketing Group, Inc.*, No. 06-2272 (M.D. Fla. 2006), the court granted the FTC an *ex parte* TRO with an asset freeze that the FTC served on banks known to hold the defendants' assets. After being served with the TRO, one of the defendants successfully withdrew over $500,000 from accounts previously unknown to the FTC, most of which were wired to offshore bank accounts.

g. In *FTC v. National Consumer Council*, No. 04-0474 (C.D. Cal. 2004), the court granted the FTC's *ex parte* application for a TRO with asset freeze and the

appointment of a temporary receiver against all but one of the corporate defendants. One of the individual defendants then deleted key electronic files on defendants' shared network server by accessing his account through a computer under the control of the corporate defendant that was not under the receivership.

h. In *FTC v. Canada Inc., et al.*, No. 04 C 4694 (N.D. Ill. 2004), Canadian authorities executed a search warrant on the business premises of Canadian defendants. The FTC subsequently filed its complaint and its motion for a TRO with asset freeze, and provided notice to the defendants. The FTC subsequently discovered that the defendants had made several transfers totaling approximately $70,000 after receiving notice of the FTC's action. The FTC was unable to recover the $70,000.

i. In *FTC v. Access Resource Services, Inc.*, No. 02-60226 (S.D. Fla. 2002), when an individual defendant became aware of the noticed TRO hearing, he attempted to exploit the Florida homestead exemption by making a $579,600 payment to pay off the mortgage on his residence.

j. In *FTC v. Physicians Healthcare Development, Inc.*, No. 02-02936 (C.D. Cal. 2002), the defendants were given advance notice of a TRO hearing. Prior to the hearing and entry of the TRO, the defendants removed all business records and computer equipment from the business premises, none of which were recovered.

k. In *FTC v. Thomas E. O'Day*, No. 94-1108-CIV-ORL-22 (M.D. Fla. 1994), the district court denied the FTC's request for an *ex parte* TRO with asset freeze and scheduled a noticed hearing on the relief sought. Several days later, the FBI executed a search warrant on defendants' business premises as the FTC served

notice of its action and the upcoming hearing. Within hours, an individual defendant withdrew approximately $200,000 from one of his bank accounts.

l. In *FTC v. Applied Telemedia Engineering and Management, Inc., et al.*, No. 91-635 (S.D. Fla. 1991), the defendants were advised, pursuant to an agreement with the FTC, that the FTC had filed its complaint and intended to seek a TRO with an asset freeze from the court. When the FTC's agents went to the defendants' offices to serve process, they observed defendants removing boxes of documents from the premises. The FTC moved for, and received, an *ex parte* TRO the following day.

14. The following examples have been identified within the FTC as incidents in which an *ex parte* order helped remedy or mitigate defendants' attempts to dissipate assets or destroy documents:

a. In *FTC v. AWS, LLC, et al.*, Case No. 2:18-cv-00442-JCM-PAL (D. Nev. filed Mar. 12, 2018), the FTC sought and obtained an *ex parte* TRO with an asset freeze. After being served with the TRO, one of the individual defendants attempted to dissipate more than $400,000 in violation of the asset freeze by visiting two local banks and purchasing certified checks and wire transferring funds to a business associate. A second individual defendant immediately withdrew $2,400 from his credit union upon learning of the TRO. The individual defendants' financial institutions alerted the FTC shortly thereafter in compliance with TRO asset freeze provisions and the transactions were successfully reversed.

b. In *FTC v. Goldman Schwartz Inc.*, No. 13-cv-00106 (S.D. Tex. 2013), the FTC obtained an *ex parte* TRO with an asset freeze against numerous corporate and individual defendants, including the companies' owner. Within an hour of being

served with the TRO, but before the asset freeze had been fully implemented, the owner withdrew approximately $268,000 from a frozen corporate account. Shortly thereafter, the owner sold approximately $160,000 in securities held in a personal trading account. The next day, the owner's wife withdrew another $18,500 from a non-defendant corporation's account that was subject to the asset freeze. Because the court had issued its asset freeze in advance of these actions, the FTC and a court-appointed monitor were able to recover all of the money.

c. In *FTC v. Sameer Lakhany*, No. SACV 12-337 CJC (C.D. Cal. 2012), the day after the court granted the TRO, but before the FTC could effect service, the defendant's employee notified the defendant of the FTC's lawsuit and receivership. The individual defendant proceeded to withdraw $204,000 from corporate bank accounts in violation of the asset freeze. The defendant later stipulated to the contempt, and the majority of the withdrawn funds were recovered.

d. In *FTC v. Prime Legal Plans LLC*, No. 12-cv-61872 (S.D. Fla. 2012), upon hearing of the *ex parte* TRO including an asset freeze, the defendants transferred $1.7 million in assets to a girlfriend and a mother. The bank was able to recover most of the money, but approximately $200,000 was not returned.

e. In *FTC v. Asia Pacific Telecom, Inc. et al.*, No. 10-cv-3168 (N.D. Ill. 2010), the FTC obtained an *ex parte* TRO freezing the defendants' assets and prohibiting them from destroying documents. After being served with the TRO, one of the individual defendants deleted an email account used to conduct many of the illegal practices at issue in the FTC's complaint. The defendant took this step despite being served with a discovery request by the FTC for documents in the

account and despite multiple demands from the court-appointed receiver for access to the account. The court ultimately held that defendant in contempt for deleting the account in violation of the TRO.

f. In *FTC v. Fereidoun Khalilian*, No. 10-21788 (S.D. Fla. 2010), the Commission sought and obtained an *ex parte* TRO with an asset freeze. Before the banks in which the defendants held accounts could put in place the freeze, one of the individual defendant's employees withdrew large amounts of money from the company's bank accounts. The individual eventually returned some—but not all—of this money. Additionally, the individual defendant, under cover of darkness, attempted to remove assets located in his personal residence.

g. In *FTC v. Data Medical Capital, Inc.*, No. 99-1266 (C.D. Cal. 2009), the Commission moved for civil contempt and obtained an *ex parte* TRO and asset freeze. When one of the defendants learned the Commission was investigating his possibly contemptuous actions, he transferred approximately $1 million to a new personal bank account prior to the Commission's filing. While the receiver appointed pursuant to the *ex parte* TRO traced these assets, found the new account, and returned the funds to the receivership estate, the receivership estate was still diminished by the fees accrued by the receiver's efforts to retrieve the funds.

h. In *FTC v. American Entertainment Distributors, Inc.*, No. 04-22431 (S.D. Fla. 2004), the court, pursuant to an *ex parte* TRO, entered an asset freeze that froze assets of both corporate and individual defendants. Within hours of receiving notice of the asset freeze, one of the individual defendants withdrew $39,500 from

his bank account. Because he violated the terms of the asset freeze, the FTC was able to compel the individual defendant to return the money.

    i. In *FTC v. Assail Inc.*, No. 03-007 (W.D. Tex. 2003), the court issued an *ex parte* TRO, including an asset freeze. The lead defendant nonetheless transferred $200,000 after being served with the TRO. Following contempt proceedings and a lengthy appeal, the defendant repaid the transferred funds.

    j. In *FTC v. Hanson Publications, Inc.*, No. 02-2205 (N.D. Ohio 2002), Canadian defendants transferred $105,000 from a U.S. account to a Canadian account within two days of receiving service of the TRO with asset freeze. This money was later returned as a predicate to the release of attorney's fees.

    k. In *FTC v. SkyBiz.com, Inc.*, No. 01-396 (N.D. Okla. 2001), within days of the service of the TRO with an asset freeze provision, one of the primary defendants convinced an overseas trustee to withdraw $1,000,000 from the offshore account of a foreign affiliate. Because a domestic correspondent bank had been served with the TRO, it refused to transfer the funds. The money in the offshore account was preserved, and ultimately used to provide consumer redress.

15. For the above reasons, as contemplated by Fed. R. Civ. P. 65(b)(1), there is good cause to believe that immediate and irreparable damage will result to consumers, including the destruction of Defendant's records and the dissipation or concealment of assets, if Defendants receive advance notice of the Plaintiff's application for a TRO. Thus, it is in the interests of justice that this Court grant such application without notice.

16.     For the same reasons, there is good cause to believe that immediate and irreparable harm will result to consumers if any of the Defendants receive premature notice of the filing of this action. Thus, the interests of justice would be served if the Court grants the FTC's *Ex Parte* Motion for a Temporary Restraining Order and *Ex Parte* Motion to Temporarily Seal the Docket and Entire File.

Executed on: February 25, 2019

Amanda R. Grier

Attorney for Plaintiff
FEDERAL TRADE COMMISSION