Amanda R. Grier
Colleen B. Robbins
Elsie B. Kappler
FEDERAL TRADE COMMISSION
(Each appearing pursuant to DUCivR83-1.1(e))
Attorneys for Plaintiff
Division of Marketing Practices
600 Pennsylvania Ave., N.W., CC-8528
Washington, DC 20580
Telephone: (202) 326-3745
agrier@ftc.gov; crobbins@ftc.gov; ekappler@ftc.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and<br><br>    Plaintiff,<br><br>    v.<br><br>ELITE IT PARTNERS, INC., a Utah corporation doing business as ELITE IT HOME, and<br><br>JAMES MICHAEL MARTINOS, individually and as an officer of ELITE IT PARTNERS, INC.,<br><br>    Defendants. | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' EMERGENCY MOTION TO LIMIT RECEIVER'S AUTHORITY**<br><br><br>Case No. 2:19-cv-00125<br>Chief District Judge Robert J. Shelby |

Plaintiff, the Federal Trade Commission ("FTC") opposes the motion of Elite IT Partners, Inc. and James Michael Martinos ("Defendants") to limit the Temporary Receiver's authority or modify the Temporary Restraining Order ("TRO") (Dkt. No. 26) ("Def. Mot.") because it would further harm consumers, deplete the assets of the receivership, and fundamentally undermine the TRO. If granted, this request would effectively put Defendants back in business, allowing them

to communicate with the very consumers they deceived—while personally enriching themselves at the expense of the receivership's assets, which should be preserved for potential redress for Defendants' victims. Contrary to the dire picture Defendants present to the Court, consumers will not be harmed if the TRO remains intact.

On February 27, 2019, the Court imposed the TRO and appointed the Temporary Receiver, Thomas Barton, to immediately halt Defendants' deceptive business practices and maintain the status quo. The Court found the FTC's overwhelming evidence sufficient to justify the appointment of a temporary receiver and the other equitable relief requested. Defendants' motion presupposes that they are running a legitimate business and can be trusted to continue servicing consumers. The incontrovertible evidence before the Court, however, demonstrates that Defendants deceived consumers into purchasing their services. Furthermore, Defendants' actions in secretly removing property of the Temporary Receiver, after being served with the TRO, confirm the necessity of the Temporary Receiver and the relief contained in the TRO. Finally, the TRO properly maintains the status quo pending resolution of the FTC's claims.

**I.     Background**

On February 28, 2019, pursuant to the TRO, the FTC and the Temporary Receiver conducted an immediate access at Defendants' office in Orem, Utah. The Temporary Receiver took custody of the office, including computer hard drives and paper documents, and interviewed Elite employees. Forensic computer specialists from the FTC imaged the hard drives. The FTC has reviewed a portion—though not nearly all—of the documents that were collected, including telemarketing scripts, sales agent notes, financial records, and consumer complaints. This post-filing investigation not only confirms the allegations in the Complaint, but also demonstrates that: (1) numerous consumers complained directly to Elite through customer service phone calls,

letters, and chargebacks; (2) Defendants' claim that consumers will be harmed if they do not continue to provide services is false; and (3) Defendants cannot be trusted to follow the TRO without a Temporary Receiver.

## A. Defendants' Customers, Consumer Complaints, and Notice

Defendants used a deceptive diagnostic to lock consumers into long-term maintenance plans, and failed to disclose, prior to payment, that these plans renew automatically after one year, and that Defendants charged a $150 cancellation fee.[1] These facts are confirmed by the sales scripts found throughout Defendants' business premises and, notably, on the telemarketers' desks.[2] Defendants' telemarketers remotely accessed consumers' computers, showed them "evidence" of "red flags" and "infections," offered services to fix these problems while leading them to believe their personal information could be compromised, and then told them a technician has fixed their computers.[3] Defendants' deception was designed so that consumers would have no idea they were scammed.

At Defendants' offices, the FTC found hundreds of complaint letters from consumers, including complaints forwarded to Defendants by various Attorney General's offices that often went unanswered.[4] Defendants leave undisputed that Propay, their credit card payment

---

[1] Dkt. No. 9 (FTC's TRO Motion ("TRO Mot.")) at 2-9, 12-13. These fees, procured through deception, are the ones Defendants want to continue charging consumers. (Def. Mot. at 11).
[2] PX 29 (Second Declaration of Reeve Tyndall) ¶ 8. *See* Appendix A for exhibit index.
[3] TRO Mot. at 2-9; PX 29, Att. C, p. 1412.
[4] PX 29 ¶ 4, Att. B. Included is a sampling of the complaints found at Defendants' business location. Many consumers complained that they were simply looking for email assistance and ended up locked in plans they did not need, did not know about the auto renew policy and cancellation fee or did not authorize charges, had difficulty cancelling, or that Elite provided poor service or damaged their computers. PX 29, pp. 1266, 1267-68, 1270, 1274, 1279, 1295, 1297, 1298, 1302, 1303-05, 1306, 1307, 1308-09, 1310, 1311, 1316, 1319-20, 1323, 1324, 1325-27, 1329, 1338, 1340, 1341, 1342-43, 1346-47, 1353, 1354, 1357-58, 1360, 1364, 1366-67, 1371, 1372, 1375-76, 1388-89, 1392-93, 1394, 1395, 1396-98, 1399-1400, and 1401.

processor, shut off their accounts for high chargeback rates.[5] Finally, they received complaint calls daily through their customer service lines.[6] As such, it is perplexing how Defendants can argue that "Elite IT has only experienced a .05% rate of complaints over the life of its business." (Def. Mot. at 3, n. 3.)

In order to notify Defendants' existing customers and those consumers who are directed to Defendants' webpage (often through keyword searches seeking email assistance) about the Temporary Receivership over Elite IT Partners, Inc. ("Elite"), the Temporary Receiver appropriately placed a notice (Def. Mot., Exh. B) on Elite's website directed to its <u>consumer</u> clients, www.eliteithome.com.[7] Defendants' argument that the Temporary Receiver notified their *business* clients by placing the notice on "the website" (Def. Mot. at 4) is false. Defendants have a separate domain for their business clients, www.eliteitbusiness.com.[8]

### B. Cessation of Defendants' "Services" Will Not Harm Consumers

Defendants also erroneously argue that if they are unable to service their existing clients, there will be lapses in customers' security programs, and without collecting the recurring fees, they will be unable to cover the licensing fees for the third party programs rendering "the customers completely unprotected." (Def. Mot. at 11). This is untrue. Prior to the filing of Defendants' Motion, Victor Trujillo, Elite's Chief Technology Officer ("CTO"), told the Temporary Receiver that if Elite did not provide periodic services, no consumer would lose data, no consumer's computer would shut down or fail, and nothing else would occur that would prevent a consumer from using his or her computer.[9] Mr. Trujillo also mentioned that if Elite

---

[5] PX 28 ((First) Declaration of Reeve Tyndall) ¶ 57, Att. E, p. 1050.
[6] PX 13 (Declaration of Megan Valenzuela) ¶ 24.
[7] Declaration of Thomas Barton, dated March 11, 2019 ("Barton Decl.") ¶ 34.
[8] Barton Decl. ¶ 34. Defendants have fewer than 20 business clients. Barton Decl**.** ¶ 28.
[9] Barton Decl. ¶¶ 17-19.

could no longer service clients, they would not be living up to their contractual obligations.[10]
However, Elite is no longer charging consumers for their services, and in any event, the FTC's expert opined that many of Defendants' services, which took fifteen minutes or less to complete,[11] provided no security benefit,[12] and required no special skills.[13]

Furthermore, the Temporary Receiver plans to maintain all appropriate software licenses so that consumers will continue to receive the benefits of these software programs, including Trend Micro anti-virus software and Mozy back-up software.[14] As long as these licenses are paid, the software will continue to operate as before.[15] The Temporary Receiver has already sought and received Court approval to pay certain debts and obligations that were incurred prior to the entry of the TRO, which included software licensing services by Trend Micro.[16]

### C. Defendant Martinos Secretly Removed Receivership Property

Defendants have further confirmed the necessity of a Temporary Receiver by disobeying the TRO. During the immediate access and after he had been served with the TRO, Defendant

---

[10] Barton Decl. ¶ 19.
[11] PX 14 (Declaration of Harold Pomeranz), pp. 77, 81, and 87.
[12] PX 14, pp. 77, 78, 82, and 87.
[13] PX 14, pp. 78, 82, and 87.
[14] Barton Decl. ¶ 21.
[15] FTC staff spoke with both Trend Micro and Mozy (now owned by Carbonite). The product, Trend Worry Free Business Security, is meant to "set and forget" and updates automatically. It is not necessary for a technician to manually ensure the operation of the program once it is originally installed. Trend Micro said Elite pays a monthly fee for its licenses. If the fee is not paid, the product remains on the computer, but the updates for the antivirus will not continue after a 30-day grace period. The account can be reactivated by paying for the license and the protection will continue, with all updates restored. The Mozy product is similarly automated, and its licenses are also paid on a monthly basis and 15 days after non-payment, access to services is suspended. After an additional 90 days of non-payment, data is deleted. PX 29 ¶¶ 11-12. Both companies expressed a willingness to work with affected consumers.
[16] Dkt. No. 28 (Temporary Receiver's Motion for Court Approval to Pay Certain Debts and Obligations); Dkt. No. 31 (Order granting Temporary Receiver's Motion).

James Martinos secretly removed external hard drives from his office at Elite in direct contravention of the TRO and specific direction from the Temporary Receiver and the FTC.[17]

After the Temporary Receiver discovered the missing hard drives, and properly demanded their immediate return from Defendants' counsel, Defendants provided two black external hard drives to the Temporary Receiver on March 7, 2019.[18] Because Defendant Martinos removed them before the FTC or the Temporary Receiver could copy or view their contents, it is not possible to confirm whether the hard drives Martinos surrendered on March 7th are the same hard drives he removed on February 28th.[19]

## II.    Argument

Based on overwhelming evidence, this Court determined that the FTC is likely to succeed in demonstrating that Defendants have engaged in deceptive and unlawful business practices, and that "good cause" exists and the "public interest" is served by appointing a temporary receiver over Elite. This Court appointed Thomas Barton as Temporary Receiver. Defendants now move this Court to limit Mr. Barton's role and responsibilities so that Elite may continue business as usual—a business that overwhelming evidence shows was operating as a tech support scam prior to this Court's intervention. To preserve assets, and ensure that Elite's business operates lawfully and consumers are not further harmed, it is critical that the Temporary Receiver remain in place without diminishing or limiting his role. Contrary to Defendants' argument, consumers will *not* suffer harm if Defendants are not permitted to provide "services" to them. In fact, the opposite is true. The Temporary Receiver has carried out the responsibilities granted by this Court in a manner that ensures that consumers and assets are protected. Further,

---

[17] Barton Decl. ¶¶ 36-38**;** PX 30 (Declaration of Calvin Brown) ¶¶ 7-8; PX 31 (Declaration of Richard Kaplan) ¶ 9.
[18] Barton Decl. ¶ 38, Exh. B.
[19] Barton Decl. ¶ 38; PX 30 ¶ 11; PX 31 ¶ 14.

Defendants should not be permitted to profit further from their deception and cause ongoing injury to consumers.

### A. This Court's Appointment of a Temporary Receiver was Lawful and Warranted

A temporary receiver is critical because Defendant Elite has—through deception—duped unsuspecting—and often elderly—consumers into purchasing its technical support services. As the Court stated in *SEC v. Keller Corp.*, "[i]t is hardly conceivable that … those enjoined from fraudulent misconduct [would] continue in control of (the corporate defendant's) affairs for the benefit of those shown to have been defrauded. In such cases the appointment of a [receiver] becomes a necessary implementation of injunctive relief."[20] In the absence of a temporary receiver charged with maintaining the status quo, it is likely that "corporate assets will be subject to diversion and waste to the detriment of those induced" into purchasing Defendants' services and "for whose benefit" the FTC has brought this action. *See SEC v. First Fin. Group of TPX*, 645 F.2d 429, 438 (5th Cir. 1981) (finding a receiver "particularly necessary" where the corporate defendant had defrauded investors). Thus, the fact that Defendants' business is permeated by fraud justifies the appointment of a receiver.

Defendants maintain that to justify the Temporary Receiver's appointment or the scope of his charge, the FTC must show that "no lesser relief would be effective." (Def. Mot. at 8-9). They propose various alternatives to prevent dissipation of assets, preserve the status quo, and prevent legal violations. First, they argue no temporary receiver is necessary because other terms of the TRO, which prohibit illegal conduct, freeze assets, and bar charging customers of Elite IT Home, are sufficient temporary relief to protect the interests of consumers. (Def. Mot. at 9). Second, they suggest that the Temporary Receiver be converted to a mere monitor "to allow

---

[20] 323 F.2d 397, 403 (7th Cir. 1963).

Defendants to reintegrate into the day-to-day operations of Elite IT whereby Elite IT could provide ongoing services already purchased by its roughly 6,500 customers." (Def. Mot. at 9). But in making these arguments, Defendants ask this Court to accept as true that consumers were not deceived about the need for Defendants' technical support services or about recurring charges. Defendants, however, have provided no such evidence. Instead, the evidence establishes that Defendants deceived vulnerable consumers into purchasing the very services Elite asks this Court to allow it to continue to provide. Deception is the backbone of Defendants' marketing to consumers. Defendants have repeatedly shown that they are unwilling to change their practices despite numerous consumer complaints,[21] a cease and desist letter from Oath,[22] a history of excessive chargebacks,[23] being dropped by a payment processor[24] and an administrative order to register as a telemarketer and pay fines by a state authority.[25]

Defendants' actions—most conspicuously those since the imposition of the TRO—demonstrate that Defendants cannot be trusted to comply with the TRO or interact with Elite IT Home's customers. The record shows that Defendants actively engaged in deceptive telemarketing, and, even in providing so-called "customer service," upsold consumers more expensive service plans relying on deceptive representations.[26] Defendants regularly engaged in aggressive practices to prevent chargebacks and compel consumers to pay hefty undisclosed cancellation fees.[27] Moreover, notwithstanding the TRO and Mr. Barton's instructions on the day

---

[21] PX 27 ¶ 5; PX 29 ¶ 4, Att. B.
[22] Dkt. No. 9-1, PX 15 (Declaration of Sean Zadig), Atts. B and C, pp. 133-36.
[23] PX 28 ¶ 57.
[24] *Id.*
[25] Dkt. No. 9-7, PX 19 (Declaration of Leigh Veillette) ¶ 14.
[26] PX 13 ¶ 21.
[27] These practices include outright lying to its payment processor in order to avoid or reverse chargebacks. PX 28 ¶ 56; PX 29, Att. B, pp. 1265, 1281.

of the immediate access,[28] Defendant Martinos removed hard drives from his office, surreptitiously and without permission.[29] Given these facts, Defendants' proposed alternatives are untenable. It is critical that the Temporary Receiver remain in place and continue to carry out his duties to protect consumers.[30]

Defendants seek to modify the TRO to either eliminate the Temporary Receiver or compel him to permit them to service their consumer clients. This would quickly deplete the receivership assets, thus reducing the pool of funds for potential consumer redress while enriching the very officers and employees that deceived consumers.[31] Indeed, Defendants admit that Elite cannot provide costly customer services without the benefit of the income from consumers (Def. Mot. at 11), and the TRO bars them from charging consumers. TRO, Sect. III. Therefore, if Defendants' motion is granted, assets are certain to be dissipated.

### B. Consumers Will Not Be Harmed If Defendants Do Not Provide Their "Services"

Defendants, relying on a small number of calls from consumers since the issuance of the TRO, argue that if they are not permitted to provide services to the 6,854 customers of Elite IT Home, then the customers will be harmed. The record demonstrates otherwise.

Although Defendants argue that cessation of tech services from Elite will harm their customers, Elite's CTO told the Temporary Receiver the opposite[32]— contradicting Defendants' claim that without Elite providing ongoing services, customer would be exposed to "computer

---

[28] Barton Decl. ¶ 36; PX 29 ¶ 10; PX 30 ¶¶ 7-8.
[29] Barton Decl. ¶ 37.
[30] Defendants point to the circumstances in *FTC v. Apply Knowledge*, Case No. 2:14-cv-00088-DB (D. Utah Feb. 11, 2014), in support of their argument that a receiver is unnecessary. The court's decision in *Apply Knowledge*—determining at the *preliminary injunction hearing* that a receiver was not necessary—turned on facts specific to that case. Here, Defendants have yet to show cause why a preliminary injunction should not issue.
[31] According to the Temporary Receiver, monthly payroll for these services, not including benefits, taxes, or other contributions, would be more than $31,500. Barton Decl., ¶ 12.
[32] Barton Decl. ¶¶ 17-18.

viruses and los[e] valuable data on their computers." (Def. Mot., Att. A, ¶ 11). Similarly, Trend Micro and Carbonite (d/b/a Mozy) confirmed that consumers would not be harmed if Defendants were not providing ongoing services.[33] Morever, many of the products provided by Elite are "freeware" available directly to consumers.[34]

The Temporary Receiver's actions since his appointment ensure that the interests of consumers are protected. He properly provided notice to consumers of the TRO on Elite IT Home's website and informed consumers that they would not be charged for ongoing services. The notice included a phone number and email address so that consumers with questions could learn more. (Def. Mot., App. B). He has continued to pay all licensing fees,[35] and Trend Micro and Carbonite have confirmed that their programs would not lapse immediately even in the event of late payments.[36]

Since his appointment, the Temporary Receiver has judiciously exercised his authority, allowing Elite's business-to-business operations to continue, paying outstanding payroll, and satisfying other financial obligations, all while conducting extensive interviews of numerous employees and principals and reviewing the substantial documents, including electronic records, obtained from the business premises. He has worked diligently to understand the operations of Elite and to determine whether it can continue to be operated legally and profitably. Defendants seek to cut short his activities before they have even provided evidence to this Court addressing the merits of the FTC's claims that Elite was operating a tech support scam. For these reasons, and the reasons stated above, Defendants' Motion should be denied.

---

[33] PX 29 ¶¶ 11-12.
[34] Barton Decl. ¶22; Randolph Decl. ¶ 5.
[35] Barton Decl. ¶¶ 20-21.
[36] PX 29 ¶¶ 11-12.

Respectfully submitted,

Dated: March 11, 2019  /s/ Colleen Robbins
Amanda Grier
Colleen B. Robbins
Elsie B. Kappler
Federal Trade Commission
600 Pennsylvania Ave. NW
Washington, DC 20580
(202) 326-3845; agrier@ftc.gov
(202) 326-2548; crobbins@ftc.gov
(202) 326-2466; ekappler@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## Appendix A

Exhibit 1: Declaration of Janie Bennet ....................................................................................... 1

Exhibit 2: Declaration of Idella Coley ........................................................................................ 3

Exhibit 3: Declaration of Betty Dillon ........................................................................................ 5

Exhibit 4: Declaration of Sherri Greer ...................................................................................... 16

Exhibit 5: Declaration of Donald Hale ..................................................................................... 18

Exhibit 6: Declaration of Wanda Hale ..................................................................................... 19

Exhibit 7: Declaration of Belinda Harvey ................................................................................ 43

Exhibit 8: Declaration of George Ray ...................................................................................... 46

Exhibit 9: Declaration of Barbara Smith .................................................................................. 48

Exhibit 10: Declaration of Jean Smith ..................................................................................... 50

Exhibit 11: Declaration of Alex Wood ..................................................................................... 52

Exhibit 12: Declaration of John Wood ..................................................................................... 54

Exhibit 13: Declaration of Megan Valenzuela ......................................................................... 56

Exhibit 14: Declaration of Harold Pomeranz ........................................................................... 63

Exhibit 15: Declaration of Sean Zadig .................................................................................... 116

Exhibit 16: Declaration of Joshua J. Bargar ........................................................................... 137

Exhibit 17: Declaration of Diana Shiller ................................................................................ 161

Exhibit 18: Declaration of Carol Jones .................................................................................. 251

Exhibit 19: Declaration of Leigh Veillette ............................................................................. 581

Exhibit 20: Declaration of Colleen Robbins .......................................................................... 971

Exhibit 21: Declaration of Roberto C. Menjivar .................................................................... 978

Exhibit 22: Declaration of Calvin Brown .............................................................................. 982

Exhibit 23: Declaration of Yvonne Shultz.................................................................988

Exhibit 24: Declaration of Roshni Agarwal..............................................................1023

Exhibit 25: Declaration of Jonathan Aid .................................................................1030

Exhibit 26: Declaration of Jeff Lilleskare.................................................................1034

Exhibit 27: Declaration of Christine Barker .............................................................1036

Exhibit 28: Declaration of Reeve Tyndall ................................................................1040

Exhibit 29: Second Declaration of Reeve Tyndall ......................................................1256

Exhibit 30: Second Declaration of Calvin Brown ......................................................1453

Exhibit 31: Declaration of Richard Kaplan ..............................................................1457

**Certificate of Service**

I hereby certify that on March 11, 2019, I electronically filed the foregoing Plaintiff's Opposition to Defendants' Emergency Motion To Limit Receiver's Authority with the Clerk of the Court using CM/ECF, which will send a notice of electronic filing to counsel of record identified on the service list below:

Brett Tolman
Eric G. Benson
Z. Ryan Pahnke
Katherine E. Priest
Ray Quinney & Nebeker P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
(801) 532-1500
btolman@rqn.com
ebenson@rqn.com
rpahnke@rqn.com
kpriest@rqn.com

*Attorneys for Defendants Elite IT Partners, Inc., and James Michael Martinos*

Alex B. Leeman
G. Troy Parkinson
Prince Yeates & Geldzahler
15 W. South Temple, Suite 1700
100 SE Second Street, 44th Floor
Salt Lake City, Utah 84101
aleeman@princeyeates.com

*Attorneys for Receiver Thomas R. Barton*

   /s/ Colleen Robbins
Colleen Robbins