**PRINCE, YEATES & GELDZAHLER**
Thomas R. Barton (6827) (tbarton@princeyeates.com)
Sally B. McMinimee (5316) (sbm@princeyeates.com)
Alex B. Leeman (12578) (aleeman@princeyeates.com)
G. Troy Parkinson (9011) (gtp@princeyeates.com)
15 West South Temple, Suite 1700
Salt Lake City, Utah 84101
Telephone: (801) 524-1000
Facsimile: (801) 524-1098

*Attorneys for the Receiver*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ELITE IT PARTNERS, INC., a Utah corporation doing business as ELITE IT HOME, and JAMES MICHAEL MARTINOS, individually and as an officer of ELITE IT PARTNERS, INC.,<br><br>Defendants. | **DECLARATION OF RECEIVER IN RESPONSE TO EMERGENCY MOTION TO LIMIT RECEIVER'S AUTHORITY**<br><br>Civil No. 2:19-cv-00125-RJS<br><br>Hon. Robert J. Shelby |

I, Thomas R. Barton, under oath and subject to penalty of perjury, state as follows:

1. I am an adult and competent to testify.

2. Unless otherwise stated, I have personal knowledge of the following facts:

3. I am the court-appointed temporary receiver ("Receiver") over Elite IT Partners, Inc. ("Elite IT"), and each of its subsidiaries, affiliates, successors and assigns (collectively the

"Receivership Entities"[1]). The Court appointed me on a temporary basis subject to certain duties and authority. *See generally*, TRO, Order: §§ XIII, and XIV.

4. I was appointed on February 27, 2019, and on the morning of February 28, 2019, I assumed control of the Receivership Entities pursuant to an "immediate action" operation as authorized in the TRO, Order: §XXIII.

5. I have retained the firm of Prince Yeates & Geldzahler ("PYG") to represent me and have enlisted attorneys and staff at PYG to assist me generally I have retained accountants, Rocky Mountain Advisory Services, Inc. ("RMA") to assist with financial matters. I have also consulted with Inbound Computer Solutions, which provides information technology ("IT") services to PYG.

6. Since February 28, 2019, I have spent all, or part of, every business day on the business premises of Elite IT—except for Thursday, March 7 and today, March 11. When I have not been there, someone from my team has been there. I, and members of my team (as described above), have interviewed most of Elite IT's employees, some former employees, we have reviewed various documents, we have observed operations of Elite IT, and I have given instructions with regard to ongoing operations of Elite IT. I have developed a familiarity with the business of Elite IT, although I do not claim to understand all the details of its operations.

7. Within the company, there is a degree of separation between the "consumer" side of Elite IT's business, and the "business to business" ("B2B") side, where the company provides IT services, consulting services, and marketing services to business clients. For many of the B2B

---

[1] The Receivership Entities, as defined in the *Ex Parte* Temporary Restraining Order, With Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief [Docket No. 15] (the "TRO"), includes Elite IT Partners as well as any other entity that has conducted any business related to the marketing or sale of its technical support products and services, including receipt of Assets derived from any activity that is subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any other defendant in this matter. *See* TRO, p. 5.

clients, Elite IT effectively acts as the clients' IT department. For other B2B clients, Elite IT may provide website services, marketing services and other IT-type services as needed.

8. Although some employees work on tasks related to both aspects of the business, Elite IT has an operations and support group that functions mainly on the B2B side. This consists of four full time employees and is headed by Wally Randolph. At least five other employees provide support, consulting, marketing and development services for B2B clients—in addition to also working on the consumer side. There is also a technical support and customer service group that services both consumers and B2B clients.

9. In terms of the consumer side, the TRO restrains Elite IT from charging or billing any person for Technical Support Products or Services ("TSPS"). TRO, Order: § III. I have taken steps to ensure that Elite IT is no longer billing for any of these services or receiving funds for them.

10. The TSPS include the ongoing support services that Mr. Randolph describes in his Declaration, ¶¶ 5, 6, 10, 11, 12.

11. As I understand it, those support services were provided by around 20 technicians and customer support service employees. When I assumed control of Elite IT on February 28, 2019, I shut down all operations of the company on the consumer side, and put all of these employees on administrative leave without pay.

12. To now provide such support services, I believe the Receivership would need to re-engage those employees (and their supervisors) and pay them. A rough estimate of this monthly employment cost, based on existing payroll records, is at least $31,500. This does not include any costs of benefits, employment taxes or other contributions; nor does it include the

employment cost of any upper level management—other than John Tagg (to the extent he is considered upper level management).

13. Thus, if Elite IT were to provide the ongoing support services identified by Mr. Randolph, there would be a substantial outflow of Receivership assets, with no corresponding revenue.

14. The TRO charges me with conserving, holding, managing and preventing the loss of Receivership assets. TRO, Order: § XIV.D. I believe the provision of the support services would be contrary to the directions of the Court as contained in the TRO, and a drain on Receivership assets.

15. Also, it is not clear to me that these operations can be continued lawfully. *See* TRO, § XIV.T. These support services result from, and are part of, the trade practices that the FTC has argued are deceptive and unlawful, and which the Court has restrained based on evidence submitted by the FTC. *See* TRO, Findings of Fact: A, B, C, Order: § I.A. In providing the support services, it is my understanding that Elite IT's personnel make representations about viruses, infections, and alleged threats to the consumer's computer, and may try to get the consumers to purchase additional services. This is another reason I decided to suspend the provision of these support services.

16. If these ongoing support services—i.e., "tune-ups," monitoring, maintenance, and assistance—are not provided, I do not believe Elite IT's consumer customers would be significantly harmed.

17. On March 6, 2019, at approximately 4pm, I discussed this topic with Victor Trujillo, Elite IT's chief technical officer ("CTO"). My colleague, Troy Parkinson was also present.

18. I asked Mr. Trujillo about the various care plans offered by Elite IT, and what would happen if those periodic services were not provided. Specifically, I asked him if consumers would lose their data, he said, "No." I asked him if a consumer's computer would shut down or fail. He said "No." I asked him if there would be some other consequence that would prevent a consumer from using his or her computer. He said "No."

19. Mr. Trujillo indicated that unwanted cookies and toolbars might accumulate on a consumer's computer. And he indicated that anti-virus programs might not be updated or upgraded. Ultimately, he said the consequence would be that Elite IT would not be living up to its contractual obligations. Of course, because Elite IT is no longer charging its consumers for ongoing services, I believe it is unlikely that there is a contractual violation. And, as explained below, in the immediate term I intend to continue paying Elite IT's license fees so the anti-virus, data storage, and identity theft protection programs on the consumer's computers remain operable.

20. In terms of consumer software licenses, as referenced in Mr. Randolph's Declaration, ¶¶ 5, 7 and 8, RMA's analysis of Elite IT's accounting records shows the following:

    a. Trend Micro. This anti-virus software paid through Ingram Micro. It was last paid on 2/11/2019 in the amount of $5,867.52 (paying an invoice dated 1/14/2019). A copy of the most recent invoice, attached as Exhibit A, shows licenses for 6246 users at a cost of $.96 per license.

    b. Mozy Business Solutions. This data storage program fee was last paid on 2/25/2019, for $8,567.50, in payment of an invoice dated 2/22/2019.

    c. Net Nanny. RMA could find no record of payments to Net Nanny. It is possible that Elite IT uses a free version of the Net Nanny software.

d. Life Lock. This was last paid on 2/25/2019, for $3,080.44 in payment of an invoice dated 1/31/2019.

e. Superantispyware, Malwarebytes, CCleaner and IObit. There is no record of payment for these programs. Jacob Martinos, Elite IT's CFO, indicated to RMA personnel that there were no payments going to these providers because they offer "robust freeware cleaning tools."

21. I intend to continue paying these licensing fees for the benefit of Elite IT's consumer customers. In fact, the Receiver's Motion for Court Approval to Pay Certain Debts and Obligations, which the Court granted, includes payment of the Ingram invoice referenced in Paragraph 20.a, above.

22. As long as these licensing fees are paid, it is my understanding that the consumers will not lose their existing data backup, anti-virus protection, and identity theft protection. The other software programs—parental controls (Net Nanny) and systems designed to reduce so-called malware and clutter (Superantispyware, Malwarebytes, CCleaner and IObit)—appear to have been provided to consumers at no cost to Elite IT.

23. I have started reaching out to the providers of the software to confirm that their programs will not lapse if Elite IT's ongoing technical support services are not provided. To date, I have confirmed this with Trend Micro, whose general counsel indicated that its platform is designed to be a "set it and forget it" product, and that independent customer service is provided by Trend Micro.

24. As far as I am aware, there are only two things that Elite IT's consumer customers are not currently receiving: 1) the periodic cleanings and scans; and 2) the help desk call support.

In my view, the failure to provide these services—especially since customers are no longer paying for them—is not creating undue harm to the consumer customers.

25. That said, if there is a way to efficiently provide support to those consumer customers, if any, whose needs are truly emergent because the Elite IT-provided programs (Trend Micro antivirus protection, Mozy data back-up, Net Nanny parental controls, etc.) are not actually functioning, I am happy to consider that option.

26. One of the initial concerns, as expressed by Mr. Martinos and his counsel, was the maintenance of the B2B aspect of Elite IT's business. I am aware of my duty to conserve and manage this aspect of Elite IT's business while I evaluate whether it can be operated lawfully and profitably. *See* TRO, Order: §§ XIV.D, T. and V.

27. RMA has conducted a preliminary analysis of Elite IT's B2B business using company records.

28. Currently, Elite IT has fewer than twenty ongoing B2B clients. Of those clients, seven appear to be likely to generate more than $10,000 in annual revenue; four appear likely to generate more than $50,000 in annual revenue. Some of Elite IT's B2B clients are typical small businesses—such as a small law office, a dentist and a landscaper.

29. In 2017 and 2018, the B2B clients generated approximately $300,000 in revenue for Elite IT. This was less than 10% of its total revenue for those years. Based on figures for 2019 and my preliminary impressions, it is possible that this total could increase due to the addition of two new accounts.

30. At this stage of the temporary Receivership, I have tried to maintain the status quo of the B2B aspect and have allowed (and instructed) certain Elite IT employees to perform ongoing tasks for their B2B clients.

31. Based on my preliminary observations, Elite IT employees appear to be in regular contact with its important B2B customers. I have instructed Elite IT employees to come into the office and provide necessary services to the B2B customers. In at least two cases, Elite IT employees have been on-site with the customer. I have personally witnessed Elite IT employees telephoning or otherwise communicating, from the Elite IT offices, with B2B customers.

32. My team and I have interviewed various employees who have provided technical support services for the company—including some employees who have provided such services on both the consumers side and for B2B clients. The support services provided by Elite IT to its B2B clients are materially different from those provided to its consumer customers. The technicians on the B2B side are more highly qualified and perform more technically sophisticated tasks. The provision of these services requires additional training and/or education. These services include regular on-site visits, replacing switches and dealing with other hardware issues, firewall issues, system failures, email failures, telephone systems, etc. Elite IT is able to service its B2B clients without employing all the employees referenced in paragraphs 11 and 12.

33. To date, I am not aware that any of the B2B customers have complained about the Receivership or threatened to cancel their relationship with Elite IT because of it. I am not aware of any B2B customer being confused by the pop-up notice I have placed on the Elite IT Home website.

34. Notably, Elite IT has four websites of which I am aware: 1) www.eliteithome.com; 2) www.eliteitbusiness.com; 3) www.eliteitpartners.com; and 4) eliteitmarketing.com. I have NOT included the pop-up notice on any of the websites other than the Elite IT Home website; nor have I placed any voice or other messaging about the Receivership on any of the B2B communication channels.

35. If a B2B client were to have questions, concerns, or confusion about the impact of the Receivership, it is my view that it would be very easy for that client to contact one of the Elite IT employees with whom it deals regularly, and whom I have allowed to continue working for the company, to discuss the matter. I have also told Mr. Randolph that I am happy to discuss the scope and impact of the Receivership with any B2B client. So far, I have not spoken with any such client.

36. During the "immediate action" operation on February 28, 2019, I instructed all the Elite IT employees not to remove any items from the company's offices. I believe I said this when all the employees were gathered in a group in a conference room. Mr. Martinos was present.

37. Mr. Martinos, however, removed some external hard drives from his office drawer without informing me. On the morning of February 28, while Elite IT employees were still present at the offices, FTC personnel noticed two or three hard drives in one of the drawers in Mr. Martinos's office. The FTC personnel intended to image them later that day. That afternoon, after the Elite IT employees had left, the drives were gone. Notably, there was a three to four-hour period, after I gained access and control of the premises, during which Elite IT employees, including Mr. Martinos, remained in the Elite IT offices while my team conducted interviews and gathered information. Although the employees generally remained in the front area of the offices, there were times that employees wandered to the back where the individual offices are. Also, we allowed employees, including Mr. Martinos, to return to their individual offices in order to gather things like phones, keys, etc.

38. Once the FTC personnel informed me about the missing drives and I confirmed that the drives had not been removed by anyone on my team, I asked counsel for Mr. Martinos

about them. *See* email and letter collectively attached as Exhibit B. Mr. Tolman promptly responded and indicated that Mr. Martinos had taken the drives, which he claimed "have personal files and pictures." Mr. Martinos returned two drives to the Receivership the following day. We have not yet accessed the drives.

39. Although Mr. Martinos has otherwise complied with my instructions and the TRO, as far as I am aware, I bring this episode to the Court's attention because it causes me concern. Mr. Martinos removed the drives against my instructions, and I have no way of knowing for sure whether the drives he returned are actually the drives that were removed.

DATED this 11th day of March, 2019.

/s/ Thomas R. Barton
Thomas R. Barton

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **RECEIVER'S DECLARATION IN RESPONSE TO EMERGENCY MOTION TO LIMIT RECEIVER'S AUTHORITY** was filed with the Court's e-filing service this 11th day of March, 2019, which sent notice to the following:

    Amanda R. Grier (agrier@ftc.gov)
    Colleen B. Robbins (crobbins@ftc.gov)
    Elsie B. Kappler (ekappler@ftc.gov)
    FEDERAL TRADE COMMISSION
    600 Pennsylvania Ave. NW, CC-8528
    Washington, DC 20580

*Attorneys for the Federal Trade Commission*

    Brett L. Tolman (btolman@rqn.com)
    Eric G. Benson (ebenson@rqn.com)
    Z. Ryan Pahnke (rpahnke@rqn.com)
    Katherine Priest (kpriest@rqn.com)
    RAY QUINNEY & NEBEKER P.C.
    36 South State Street, Suite 1400
    P.O. Box 45385
    Salt Lake City, Utah 84145-0385

*Attorneys for Elite IT and James Martinos*

                              /s/ Alex B. Leeman