**PRINCE, YEATES & GELDZAHLER**
Thomas R. Barton (6827) (tbarton@princeyeates.com)
Sally B. McMinimee (5316) (sbm@princeyeates.com)
Alex B. Leeman (12578) (aleeman@princeyeates.com)
G. Troy Parkinson (9011) (gtp@princeyeates.com)
15 West South Temple, Suite 1700
Salt Lake City, Utah  84101
Telephone:  (801) 524-1000
Facsimile: (801) 524-1098

*Attorneys for the Receiver*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ELITE IT PARTNERS, INC., a Utah corporation doing business as ELITE IT HOME, and JAMES MICHAEL MARTINOS, individually and as an officer of ELITE IT PARTNERS, INC.,<br><br>Defendants. | **DECLARATION OF RECEIVER**<br><br>Civil No. 2:19-cv-00125-RJS<br><br>Hon. Robert J. Shelby |

I, Thomas R. Barton, under oath and subject to penalty of perjury, state as follows:

1.      I am an adult and competent to testify.

2.      Unless otherwise stated, I have personal knowledge of the following facts:

3.      I am the court-appointed temporary receiver ("Receiver") over Elite IT Partners,

Inc. ("Elite IT"), and each of its subsidiaries, affiliates, successors and assigns (collectively the

"Receivership Entities"[1]).  The Court appointed me on a temporary basis subject to certain duties

and authority.  *See generally*, TRO, Order: §§ XIII, and XIV.

     4.     I have previously submitted two declarations. *See* Dkt Nos. 34 and 56.  The

contents of those declarations are incorporated herein.

     5.     This declaration is meant to provide an informal status report and address certain

allegations contained in Mr. Martinos' Memorandum in Opposition to FTC's Motion for Ex

Parte Temporary Restraining Order (the "Opp. TRO") (Dkt. No. 67) that I believe need

correcting or clarifying for the benefit of the Court.

     6.     The vast majority of Elite IT's operations is its "home" business, where it

provided "technical support services and products" ("TSPS," as that term is defined in the TRO)

to individuals and their home computers.  This side of Elite IT's operations represented over

90% of its revenue over the last few years. *See* Accounting of the Assets and Financial Condition

of the Receivership ("Accounting"), Dkt. No. 53-1, pp. 4-5.

     7.     Almost all of Elite ITs employees were involved, in one way or another, in the

home operations.  Since the home side of the business has been shut down and I have been

operating Elite IT's business-to-business ("B2B") side only, it has used just twelve employees.

Of those twelve, only three have been utilized on a full time basis.  Most, if not all, of the others

have been working less than half-time.

---

[1] The Receivership Entities, as defined in the *Ex Parte* Temporary Restraining Order, With Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief [Docket No. 15] (the "TRO"), includes Elite IT Partners and any other entity that has conducted any business related to the marketing or sale of its technical support products and services, including receipt of Assets derived from any activity that is subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any other defendant in this matter.  *See* TRO, p. 5.

8.     The accountants I have retained, Rocky Mountain Advisory, Inc. ("RMA") have concluded that Elite IT's B2B operations are not profitable as a stand-alone operation. *See* Accounting, p. 6; *see also* Declaration of John Curtis, ¶¶ 10-11, April 18, 2019.  I have not seen anything to indicate that this conclusion is incorrect.

9.     Nevertheless, I have continued to operate Elite IT's B2B operations in order to try to preserve the status quo through the preliminary injunction hearing.  The TRO does not prohibit operation of the B2B business, and I have found no indication that Elite IT's B2B business is being conducted unlawfully.  Also, Mr. Martinos has insisted, from the first moments of the receivership, that the B2B business be sustained.  Revenue from the B2B operations also helps offset some of Elite's fixed expenses—such as rent—and the ongoing cost of maintaining software licenses for Elite IT's home consumers.

10.     RMA estimates that the receivership's operation of the B2B business results in a monthly loss of $17,000. *See* Curtis Decl., ¶ 11.

11.     Currently, the receivership's bank account has a balance of $550,301.94.

12.     Mr. Martinos criticizes me for having attorneys "around the clock" at Elite IT in order to oversee the B2B operations. Opp. TRO, p. 43.  Given Mr. Martinos' insistence that these operations be maintained, I believe this criticism is unfair.

13.     The Court has charged me with securing Elite IT's premises, taking exclusive possession of receivership assets and documents, and preventing loss. *See* TRO, Order: § XIV. B-E, H.  In order to carry out these duties, I believe Elite IT's B2B employees—especially members of its management team—need to be overseen by me or someone on my team while

3

they are at Elite IT working on company computers and accessing company data. Representatives of the FTC agree.

14.     We are doing what we reasonably can to try to minimize the expense of having on-site supervision of Elite IT's B2B employees.  The only two people from my team who now go to Elite IT are myself and Troy Parkinson, who is there most of the time.  Mr. Parkinson lives in Orem, less than ten minutes from Elite IT.  So, it is convenient for him and there are no travel expenses associated with his visits.

15.     When Mr. Parkinson and I are there, we are often working on receivership tasks that would otherwise be done from our offices.  This does not constitute an added expense for the receivership.  Also, we often perform tasks for other clients while we are on site at Elite IT, and none of this time is billed to the receivership.

16.     Since I informed Elite IT's B2B customers of the TRO and the receivership, only one of them has exercised its right to terminate its contract with Elite IT.  Opp. TRO, pp. 31-32. That customer, however, was not projected to bring in any revenue at all for 2019.  *See* Curtis Decl., ¶¶ 8-9.  At this time, no other B2B clients have terminated their contracts, and I believe most (if not all) are current on their payments to Elite IT—including Elite IT's largest B2B client, Lincoln City.

17.     The home side of Elite IT's business is not operating—except that I have continued to use receivership funds to pay the license fees associated with all the software Elite IT provided to its home consumers.  Although Elite IT's consumers are not receiving regular "cleanings" and other support services from Elite IT, they are continuing to receive the benefit of software that Elite IT installed on their computers.

4

18.     In accordance with the Court's TRO, Order: III, Elite IT stopped taking payments from its home consumers on February 28, 2019.  Thus, its consumers are not paying anything for this ongoing protection.[2]

19.     Two of the major software providers, Trend Micro and Carbonite (fka Mozy) have expressed a willingness to provide free customer service (for their products) to Elite IT consumers.  Although I have been in discussions with these entities, such free service has not yet been rolled out as we are continuing to discuss logistics and details.  I am hopeful that it will be available soon.  Based on my discussions, I am optimistic that, if the receivership is extended, these providers could provide free customer service for a period of time beyond April 30, and they could assist the receivership in transitioning Elite IT consumers to a direct user relationship with these products at a future date, if appropriate.

20.     At the hearing on March 12, 2019, Mr. Martinos' counsel stated that the receivership was harming Elite IT's home consumers because they were not getting the personal technical support previously provided by Elite IT.  This claim is repeated in Mr. Martinos' opposition, pp. 32-33.

21.     At the hearing, Mr. Martinos' counsel stated that he would like to have me authorize Elite IT's technical staff to provide such support.  He said that he would make a proposal, and I said I would consider it.  I have not received such a proposal from Mr. Martinos' attorneys.

---

[2] The exception to this statement consists of consumers who paid their annual contract fee in advance.  We have not yet ascertained all their identities or how many there are.

22.     Since the institution of the receivership, my team and I have come into contact with hundreds of Elite IT home consumers.  We have an informational receivership website (www.eliteitreceivership.com), and email address, and a dedicated telephone number that consumers can call for information.  The website is updated with information about the case, copies of filings by all parties, and includes an FAQ section.  We have responded to hundreds of telephone calls and emails from consumers and we are trying to keep them informed of what is happening.

23.     Elite IT's home consumers are primarily elderly, and they are not tech savvy.

24.     Karen Kendrick, a paralegal with my law firm, Prince Yeates & Geldzahler ("Prince Yeates"), has responded to most of the telephone calls.  *See* Kendrick Decl., ¶¶ 3-7 (Dkt. No. 80.)  The consumers with whom she has spoken personally and who have given their age are all over 54.  The average age is 75.  *Id*. at ¶¶ 10-12.  I have spoken with some of these people myself, and my experience is similar to Ms. Kendrick's.

25.     This conclusion is confirmed by other facts.  For example, I spoke recently with an Elite IT technician, Joseph Young, who reached out to me after having seen the Receiver's Waiver. (*See* Dkt. Nos. 66-1 and 69.)  When I asked Mr. Young how old the consumers were, he said, "mostly ancient."  He estimated that 95% of the consumers he spoke with were over 55.[3]

26.     Another employee I spoke with personally, Jayden Hales, described Elite IT's consumers as "non-tech savvy people about retirement age."  He compared them to his

---

[3] As far as I am aware, Elite IT did not keep track of the age of its "home" consumers.  This data is not recorded in Elite IT's CRM.

grandparents.  I spoke with Mr. Hales on March 8, 2019 when he came into the Elite IT offices to get a paycheck.

27.     Mr. Hales had been a sales representative for Elite IT, but he quit about a week before the Court's TRO, while he was still in training.  He said he quit because he was not comfortable selling Elite IT's products and services.  He told me that, as a sales representative for Elite IT, he was selling something the consumers "didn't understand and didn't need."

28.     Large posters in Elite IT's sales floor and its training room indicate that their consumers are "not tech savvy." *See* photographs attached as Exhibit A.

29.     Also, I found some hand-written notes[4] in the office of the sales supervisors that identify Elite IT's customer base as "0-1," on a "Tech Savvy Skills" scale from zero to ten. *See* notes attached as Exhibit B.

30.     I have read the declaration of Dennis Higgins. (Dkt. No. 67-2.)  I spoke with Mr. Higgins over the phone on March 19, 2019.  He was happy with Elite IT's services and asked if there was any way he could support its cause.  I gave him the telephone number of Mr. Martinos' attorneys.

31.     Based on my conversation with him, I understand that Mr. Higgins has a basic level of technical knowledge and he uses Elite IT's home products in order to operate his business.  In this regard, Mr. Higgins is not representative of most of  Elite IT's home consumers.

---

[4] I believe the handwriting is that of Aaron Berry or Tyler Wixom.  They share the office where I found the notes.

32.     Elite IT home consumers are generally individuals who need assistance with a personal—i.e., non-business—computer (or other device) at their residence.  I asked Joseph Young whether many home consumers were businesses, and he said this occurred "infrequently."

33.     It is important for the Court to remember that, when Elite IT responds to a request for help from a new and potential customer, it is an Elite IT sales representative who makes that call, not a technician.

34.     The sales representatives receive extensive training and training materials, as documented by Mr. Martinos in his opposition.  In addition, the sales representatives take an exam at the conclusion of their training.  I have attached copies of that exam with regard to two employees because I think it may be instructive for the Court. *See* Exhibit C.

35.     Elite IT's sales representatives are trained to sell Elite IT's products—not to personally provide a solution to a consumer who has requested assistance.  Sales representatives are trained that they are not qualified to assist; only the technicians can solve the consumer's problem. *See* Ex. C, Q. 44.  Elite IT's human resource director, Jonathon Olsen, reported that when the company recruits for sales people, it specifically does not look for any technical experience.

36.     In fact, Elite IT disciplines its sales representatives for fixing computer issues or coaching the consumer to a solution. *See* excerpts from certain personnel files, attached as Exhibit D.[5]  For example, Nefi Rios Lazo was given a disciplinary 1st warning because he

---

[5] All the documents from personnel files were gathered by me or Troy Parkinson, and copied from Elite IT's hard copy files or electronic files.  All these documents appear to have been kept in the ordinary course of Elite IT's business.

"verbally coached customer where to go and what to do to fix issue." Ex. D, p. 2.  I have found

other documents where coaching a customer is listed as a "violation," and Mr. Rios Lazo was

separately instructed, "don't fix the issue." *See* Ex. D.

37.     Elite IT's technicians attempt to fix the issues and provide such solutions.  I have

spoken with a number of Elite IT technicians (TJ Tagg, Timothy Twelker, Joseph Young, etc.)

who are adamant about the value of the help and assistance they provide to Elite IT's consumers.

We have also spoken with consumers who have been pleased with the service and solutions

provided by Elite IT.  But the technicians only get involved if, and after, a sales representative

has made a sale of an Elite IT service or product.

38.     Several employee interviews have confirmed that there is significant tension

between the technicians and the sales people at Elite IT.  This was reported to us on the first day

of the receivership when we interviewed employees.   According to Mr. Tagg, supervisor of the

technicians, there was a "constant struggle" between the technicians and the sales staff.  The

sales representatives promise things that sometimes cannot be delivered (such as guaranteeing

the recovery of a password) in order to make a sale, and then the technicians have to deal with an

angry consumer.

39.     This situation was confirmed by two technicians I spoke with later: Wesley

Fullenwider and Joseph Young.  Both men reached out to me in order to talk.  They said sales

representatives did more than just over-promise, they lied.  According to these former

employees, the lies often related to the ability to recover passwords and/or access accounts;

claimed "partnerships" with or "authorizations" from companies like AOL, Google or Microsoft;

and whether something was a "virus."

40.     Mr. Young[6] said the primary problem was that Elite IT refused to adequately teach its sales representatives about computers, and therefore the sales representatives made things up and lied in order to make sales.  He singled out a particular sales representative, Shelby Hammond, as someone who repeatedly lied to consumers.  He called Ms. Hammond "walking scareware."  He said she told consumers that the "L" logo on the taskbar of their Lenovo computers was the "L virus," when it is simply Lenovo's pre-installed program for accessing the computer's settings.  He said she told consumers that if their CPU was running more than 60 processes, it was proof of a virus, which is false.[7]  He said he knew these things because he, in his role as technician, had listened to sales calls by Ms. Hammond.[8]

41.     Mr. Young said he personally complained about Ms. Hammond regularly (every other week) to management (Dalin Petersen, Heather Martinos, and Aaron Berry).  He said he knew other technicians and customer service representatives complained about her as well.  He said management's response was essentially, "What do you want us to do, fire her?  How do we tell Jim [Martinos] that one of his highest grossing sales reps isn't selling right?" Mr. Young said he did not think Ms. Hammond was ever disciplined for her sales techniques.

---

[6] Initially, Mr. Young said he would sign a statement and appear as a witness.  Since then he has decided not to do so.  I recognize Mr. Young's statements are hearsay.  But they are accurately reported, and I think they are material.  The Court can exclude them or give them the weight they deserve.

[7] Mr. Young referenced another sales representative who lied by telling a consumer that because Elite IT's technicians were Microsoft certified they could access back-end code to change security settings in order to gain access to email.  Mr. Young said this is just not true, but he could not remember the same of the sales representative, who was eventually fired.

[8] Elite IT retains the calls between its personnel and consumers, and they are accessible through the CRM.

42.     I reviewed Ms. Hammond's personnel file, and relevant excerpts regarding discipline are attached as Exhibit E.  Ms. Hammond received two disciplinary warnings, but neither one identified lying to consumers as a violation.  *See* Ex. E, p. 1. Among other things, she was disciplined for not following the script at all times and disregarding policy and management coaching, but the specifics of the violations are not indicated.

43.     RMA has confirmed that Ms. Hammond was the second highest paid sales representative, in terms of commissions, for the period from January 1, 2018 through February 2019.  *See* Exhibit F.  She is also covered by Elite IT's health insurance—a benefit that was not offered to run-of-the mill employees.

44.     I have met Ms. Hammond and I know where her work station is on the sales floor. It is in a corner, and there is a large trophy there labelled "The Dumbledore."  It is my understanding that the trophy indicates the top Elite IT sales representative.

45.     I am aware that in the administrative proceeding before the Utah Division of Consumer Protection, Presiding Officer Bruce L. Dibb entered a ruling against Elite IT, and that ruling was confirmed by the Department of Commerce. *See* Plaintiffs Exhibit ("PX") 19, pp. 919-938, 950-963 (Declaration of Leigh Veillette, Attachment I).  Officer Dibb observed that Elite IT's sales person, Chris, "guided" an unsophisticated consumer, who needed immediate help, to purchase an annual contract using "classic hard pressure sales tactics." *See* PX 924, ¶¶ 22, 23.

46.     I do not disagree with this assessment of Elite IT's sales practices.  Elite IT's sales representatives are trained to sell aggressively.  And they are trained to push one solution in particular: the annual care plans.

47.     Elite IT's highest paid sales representative, Carol McKinney, listed one of her weekly sales goals as "Blood out of turnip." *See* selected sales forms and reports, attached as Exhibit G, p. 1.  One of Ms. McKinney's managers wrote to her: "Focus on selling CPs [care plans]/ Assume that they want it / Let them tell you that they don't." *Id*. at p. 2.  Another sales representative, Mr. Rios-Lazo listed an area of improvement as "Don't be okay / give up when they say 'no'." *Id.* at p. 4.

48.     Sales documents I have looked at repeatedly stress using "urgency" to make a sale, overcoming consumers "objections," not giving up, and "assuming the sale."  *See* Ex. G, *generally*.

49.     The big posters on the walls of Elite IT's sales area and its training room say things like:

THEY'RE NOT TECH SAVVY

TAKE CHARGE

ASSUME THE SALE

BUILD VALUE AND URGENCY

*See* Ex. A.

50.     Although Elite IT offers a number of different products, its sales representatives are encouraged to try to sell one solution in particular: care plans that involve annual or monthly recurring charges and a cancellation fee.  Elite IT tracks the ratio between CPs (care plans) and OTFs (one-time-fixes).  It appears that Elite IT wanted at least a 1 to 1 ratio, and it pushed its sales representatives to sell care plans over one-time-fixes. *See,* selected weekly sales reports, attached as Exhibit G, pp. 1 ("pitch CPs"), 2 ("CP to OTF @ 50%"), 3 ("Goals #1 - CP to OTF

Ratio 50%"), 6 ("sell more care plans"), 7 ("8 care plans 2 one time fixes"), 13 ("offer the care

plan for the year!"), 15 ("10 CPs 3 OTF"), 16 ("11 CPs 4 OTF"), 23 ("4 plans per day"), etc.

51.     In his declaration, ¶¶ 24-30, Mr. Randolph speaks to the training of Elite IT

employees—including sales representatives—and Elite IT's recruitment of such employees.  As

far as I am aware, Mr. Randolph was not directly involved Elite IT's home sales efforts.  In Mr.

Randolph's first conversation with me, he said he oversaw Elite IT's B2B operations, its

technicians, and customer services representatives.

52.     TJ Tagg drew an organizational diagram for me indicating that the managers

responsible for sales were Heather Martinos, Dalin Petersen, Aaron Berry and Tyler Wixom.

Ultimately, sales fell underneath the responsibility of James Martinos.  See Exhibit I.

53.     I have reviewed some documents related to the individual performance of sales

representatives.  Mr. Randolph's name has not appeared in any of them.  Instead, the Elite IT

managers most often noted in these documents are the sales managers: Heather Martinos, Dalin

Petersen, Aaron Berry, and Tyler Wixom.

54.     As Exhibit B to his declaration, and as referenced in Paragraph 16, Mr. Randolph

has attached what he calls a "Screenshot of Checkbox Next to Link to Terms and Conditions."

(DX 1, 16.)  This document appears to have been created by Elite IT's CRM.  I have accessed

the CRM and pulled up a document that is identical to Exhibit B, and which appears to have

been created as a test by Victor Trujillo.  Exhibit B is a representation of what appears in Elite

IT's CRM when a user clicks on a field entitled "Authorize CC ONLY."

55.     I do not believe this image from the CRM accurately reflects what the consumer

saw when he/she was submitting payment information to purchase products or services from

Elite IT.  The screen image from the CRM appears to be a link to data on Elite IT's website, not a stored image of the screen as it appeared at the time the consumer submitted his/her payment information.

56.     More importantly, current images from the CRM for this screen appear to be different from corresponding images that Elite IT has produced previously.  Exhibit B and (as far as I can tell) all the other current images from the CRM for this screen show a box that contains portions of the terms and conditions and a scroll bar that allows the viewer scroll through the terms and conditions without leaving that particular page.

57.     Mr. Parkinson reviewed materials related to chargebacks on Jacob Martinos' computer.  Those documents indicate that at the end of July 2018, Elite IT changed this particular screen and added the box with the scroll bar.  Prior to that, the screen only contained a link to the terms and conditions, and small box for the consumer to check indicating that he/she accepted the terms and conditions.

58.     This is consistent with documents already the record.  Images of this screen that were previously produced by Elite IT to ProPay, one of its former payment processors, do not contain the box and scroll bar.  These screen images appear at PX 28, pp. 1183, 1189, 1195, 1201, 1206, 1213 and 1219 (Declaration of Reeve Tyndall, Attachment E).  Elite IT provided these images to ProPay as part of its effort to challenge requests for credit card refunds from particular customers.  The FTC obtained the documents from ProPay prior to filing this suit.

59.     Each screen image (and page of PX 28) references a customer, although that customer's identity and other information has been redacted in the exhibit.  Elite IT submitted the screen image in support of its argument to ProPay that the screens were the same as those the

14

consumer filled out on line in order to process his/her payment.  Elite IT argued that the consumer checked the box, agreed to Elite IT's terms and conditions, and therefore he/she should not be issued a refund to his/her credit card. *See, generally*, PX 28, pp. 1180-1221.

60.     I learned the identity of the seven customers in question by obtaining copies of the unredacted letters from the FTC.  I located each of the consumers in Elite IT's CRM, and pulled up the screen images in question.  They do not match the images of the screen images submitted to ProPay.  Instead, each of the screen images now looks similar to Exhibit B and contains the box and scroll bar.  I have created Exhibit J, which shows a comparison, for each consumer, between the screen as submitted by Elite to ProPay versus what is currently reflected in Elite IT's CRM.

61.     Thus, with the possible exception of transactions after July 2018, I do not believe the information from Elite IT's CRM that has been submitted to the Court by Mr. Martinos accurately reflects what the consumer saw when he/she entered his/her customer information and purchased products or services from Elite IT.  The bottom line is that I do not know what the consumers actually saw on the screen, if anything, when they purchased Elite IT's services, and I do not know whether any of the materials provided by Elite IT accurately reflect that screen.

62.     Elite IT's technicians reported that sometimes "upselling" occurs after the initial transaction in subsequent dealings with existing consumers.  This occurs when a consumer wants a service or additional tech support time that is not covered under their existing plan.  In such cases, the technician can decide whether to encourage an additional sale or plan upgrade, and then passes the consumer to Elite IT's customer service department for the transaction.  I got the impression that this does not happen very often, but that Elite IT has a process for it and does

some training.  This type of upselling was reported by TJ Tagg, Tim Twelker, and Joseph Young.

DATED this 18th day of April 2019.

/s/ Thomas R. Barton

Thomas R. Barton

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **DECLARATION OF RECEIVER** was filed with the Court's e-filing service this 18th day of April 2019, which sent notice to the following:

Amanda R. Grier (agrier@ftc.gov)
Colleen B. Robbins (crobbins@ftc.gov)
Elsie B. Kappler (ekappler@ftc.gov)
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave. NW, CC-8528
Washington, DC 20580

*Attorneys for the Federal Trade Commission*


Brett L. Tolman (btolman@rqn.com)
Eric G. Benson (ebenson@rqn.com)
Z. Ryan Pahnke (rpahnke@rqn.com)
Katherine Priest (kpriest@rqn.com)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385

*Attorneys for Elite IT and James Martinos*


/s/ Alex B. Leeman

4826-8027-9956, v. 4