Amanda R. Grier (agrier@ftc.gov)
Colleen B. Robbins (crobbins@ftc.gov)
Elsie B. Kappler (ekappler@ftc.gov)
FEDERAL TRADE COMMISSION
(Each appearing pursuant to DUCivR83-1.1(e))
Attorneys for Plaintiff
Division of Marketing Practices
600 Pennsylvania Ave., N.W., CC-8528
Washington, DC  20580
Telephone: (202) 326-3745
Facsimile: (202) 326-3395

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO VACATE THE JUDGMENT PURSUANT TO RULE 60(B) AND MEMORANDUM IN SUPPORT** |
| v. | |
| ELITE IT PARTNERS, INC., a Utah corporation doing business as ELITE IT HOME, and | |
| | Case No. 2:19-CV-125-RJS-CMR |
| JAMES MICHAEL MARTINOS, individually and as an officer of ELITE IT PARTNERS, INC., | Chief District Judge Robert J. Shelby |
| | Magistrate Judge Cecilia Romero |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................. ii

TABLE OF EXHIBITS ........................................................................................................ v

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY.............................................. 1

   I.   DEFENDANTS' SCHEME ........................................................................................ 1

   II.   LITIGATION AND SETTLEMENT ........................................................................ 3

   III.  CONSUMER REDRESS ........................................................................................... 7

ARGUMENT .......................................................................................................................... 9

   I.   SUPREME COURT RULINGS DO NOT HAVE A RETROACTIVE EFFECT ON CLOSED CASES ..................................................................................................... 9

   II.   DEFENDANTS WAIVED ANY RIGHT TO CHALLENGE THE STIPULATED FINAL ORDER ........................................................................................................ 10

   III.  RELIEF IS NOT WARRANTED UNDER RULE 60(b)(5)............................................ 10

      A.   Rule 60(b)(5) Does Not Apply to Money Judgments, Whether or Not Paid ............ 10

      B.   The Parties Did Not Misunderstand the Law ........................................................ 12

      C.   Defendants Cannot Establish That the Change in Law Warrants Rule 60(b)(5) Relief. .................................................................................................................. 14

   IV.  RELIEF IS NOT WARRANTED UNDER RULE 60(b)(6)............................................ 15

      A.   Defendants Chose to Settle and Rule 60(b)(6) Does Not Apply ............................... 16

      B.   A Change in Law is Not an Extraordinary Circumstance under Rule 60(b)(6) in This Case ..................................................................................................................... 17

      C.   Buyer's Remorse Is Not An Extraordinary Circumstance ....................................... 19

   V.   *AMG* DID NOT ALTER THE FTC'S AUTHORITY TO OBTAIN INJUNCTIVE OR MONETARY RELIEF IN THIS CASE .................................................................... 20

      A.   The FTC Retains Statutory Authority to Obtain Injunctive Relief .......................... 20

      B.   The FTC Retains Authority Under Section 19 to Obtain Monetary Relief................ 21

      C.   The Preliminary Injunctive Relief Was Necessary to Protect Consumers and Ensure an Adequate Amount of Funds for Redress.......................................................... 23

CONCLUSION...................................................................................................................... 24

CERTIFICATE OF SERVICE .............................................................................................. 26

## TABLE OF AUTHORITIES

### Cases

*Adams v. Merrill Lynch, Pierce, Fenner & Smith*, 888 F.2d 696 (10th Cir. 1989) ...........18

*AMG Capital Management LLC v. FTC*, 141 S. Ct. 1341
(2021)............................................................................... …………………………………………*passim*

*Cashner v. Freedom Stores*, 98 F.3d 572 (10th Cir. 1996)............................15, 16, 17, 20

*Collins v. City of Wichita*, 254 F.2d 837 (10th Cir. 1958)................................17

*Colon v. Berryhill*, No. 15-cv-00834, 2019 WL 5305469 (W.D.N.Y. Oct. 21,
2019) ...............................................................................................................12

*Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.*, 962 F.2d 1528 (10th
Cir. 1992) .......................................................................................................17

*Coltec Indus. v. Hobgood*, 280 F.3d 262 (3rd Cir. 2002) ..................................20

*Cox v. Horn*, 757 F.3d 113 (3d Cir. 2014)................................................. 17-18

*Davidson v. McClellan*, 16 P.3d 233 (Colo. 2001)............................................19

*Dowell v. State Farm Fire and Casualty Automobile Ins. Co.*, 993 F.2d 46 (4th Cir.
1993) ..............................................................................................................15

*Evans v. Fenty*, 701 F. Supp. 2d 126 (D.D.C. 2010) ................................... 14-15

*FTC v. Ah Media Grp., LLC*, 339 F.R.D. 612 (N.D Cal. 2021) .................................11, 20

*FTC v. Am. Future Sys., Inc.*, 2021 WL 3185777 (E.D. Pa, July 26, 2021).....................20

*FTC v. Apex Capital Grp.*, CV 18-9573-JFW(JPRx), 2021 WL 7707269 (C.D.
Cal. Sept. 3, 2021)................................................................... 10-11, 12, 16

*FTC v. Apex Capital Grp.*, CV 18-9573-JFW(JPRx), 2022 WL 1060486 (C.D.
Cal. Mar. 10, 2022).......................................................................................23

*FTC v. Cardiff*, 2021 WL 3616071 (C.D. Cal. 2021).......................................21

*FTC v. Credit Bureau Center*, LLC, 937 F.3d 764 (7th Cir. 2019)..................................16

*FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993),........................................23

*FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005) ........................14

*FTC v. Ivy Capital, Inc.*, 2:11-CV-283, 2022 WL 706507 (D. Nev. Mar. 9, 2022)....10, 11

*FTC v. John Beck Amazing Profits, LLC*, CV 9-4719, 2021 WL 4313101 (C.D.
Cal., Aug. 19, 2021).......................................................................................11

*FTC v. LoanPointe, LLC*, 525 F. App'x 696 (10th Cir. 2013)................................14

*FTC v. Neora, LLC*, 2021 WL 3398153 (N.D. Tex. Aug. 2, 2021) ............................ 20-21

*FTC v. QYK Brands LLC*, No. SACV 20-1431 PSG (KESx) (C.D. Cal. Apr. 6,
2022)..............................................................................................................23

*FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (1982) .....................................24

ii

*FTC v. Zurixx*, 441 F. Supp 3d 1216 (D. Utah 2020) ...................................................14, 16

*FTC. v. Nat. Urological Group, Inc.*, 1:04-CV-3294, 2021 WL 5774177 (N.D. Ga. 2021)......................................................................................................................11

*Harper v. Va. Dep't of Tax'n*, 509 U.S. 86 (1993) ..............................................................9

*Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176 (10th Cir. 2018) ....................15, 17

*James B. Beam Distilling Co. v. Georgia.*, 501 U.S. 529 (1991) .......................................9

*Johnson v. Spencer*, 950 F.3d 680 (10th Cir. 2020) ....................................................16, 18

*Kile v. United States*, 915 F.3d 682 (10th Cir. 2019)........................................................20

*Liljeberg v. Health Servs. Acquisiton Corp.*, 486 U.S. 847 (1988) ..................................17

*Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482 (10th Cir. 1994) ........................................................................................................................16, 18

*Nobels v. Sec. Fin. Corp. of Ga.*, 431 F. App'x 835 (11th Cir. 2011) ........................13, 14

*Pierce v. Cooke & Co.*, 518 F. 2d 720 (10th Cir. 1975) ...................................................18

*Ross v. Bush*, 704 F. App'x 771 (10th Cir. 2017).............................................................18

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) .........................12, 13, 14, 15

*Saggiani v. Strong*, 718 F. App'x. 706 (10th Cir. 2018).....................................................17

*SEC v. Ahmed*, 15-cv-13042, 2021 WL 916266 (D. Mass. Mar. 10, 2021) .....................16

*Sperry v. Werholtz*, 04-cv-3125, 2007 WL 3293276 (D. Kan. 2007)...............................15

*State Bank v. Gledhill*, 76 F.3d 1070 (10th Cir. 1996) .....................................................17

*Stokors S.A. v. Morrison*, 147 F.3d 759 (8th Cir. 1998) ...................................................12

*Strope v. Cummings*, 653 F.3d 1271 (10th Cir. 2011) ........................................................9

*Twelve John Does v. District of Columbia*, 841 F.2d 1133 (D.C. Cir. 1988)...................11

*U.S. v. Melot*, 712 F. App'x 719 (10th Cir. 2017) ...............................................10, 11, 12

*United States v. Witco Corp.*, 76 F. Supp. 2d 519 (D. Del. 1999) ...................................13

*Van Skiver v. United States*, 952 F.2d 1241 (10th Cir. 1991)............................... 15-16, 18

*Villescas v. Abraham*, 285 F. Supp. 2d 1248 (D. Colo. 2003)..........................................23

*VTA, Inc. v. Airco*, 597 F.2d 220 (10th Cir. 1979)............................................................16

*Wilson v. Al McCord, Inc.*, 858 F.2d 1469 (10th Cir. 1988)..............................................18

*Zimmerman v. Quinn*, 744 F.2d 81 (10th Cir. 1984) ........................................................15

*Zurich North America v. Matrix Service, Inc.*, 426 F.3d 1281 (10th Cir. 2005). ..............17

## Statutes & Regulations

15 U.S.C. § 45 .................................................................................................................... 1

15 U.S.C. § 57a ................................................................................................................. 21

15 U.S.C. § 57b(a)(1) ....................................................................................................... 21

15 U.S.C. § 57b(b) ...................................................................................................... 21, 22

15 U.S.C. §§ 8401-8405 ..................................................................................................... 1

15 U.S.C. § 8404(a) .......................................................................................................... 21

16 C.F.R. Part 310 .............................................................................................................. 1

## Rules & Other Authorities

Fed. R. Civ. P. 60(b) ........................................................................................................... 1

Fed. R. Civ. P. 60(b)(5) ................................................................. 9, 10, 11, 12, 13, 14, 15

Fed. R. Civ. P. 60(b)(6) ........................................................ 9, 10, 15, 16, 17, 18, 19, 20

12 Moore's Federal Practice - Civil § 60.47[1][b] ........................................................... 12

12 Moore's Federal Practice - Civil § 60.48 nn.53, 54 .................................................... 19

## TABLE OF EXHIBITS

| ECF No. | ECF Pages | Description | PX No. | Exhibit Pages |
|---|---|---|---|---|
| 9-1 | 3-5 | Declaration of Janie Bennett | 1 | 1-2 |
| 9-1 | 6-8 | Declaration of Idella Coley | 2 | 3-4 |
| 9-1 | 9-20 | Declaration of Betty Dillon | 3 | 5-15 |
| 9-1 | 21-23 | Declaration of Sherri Greer | 4 | 16-17 |
| 9-1 | 24-25 | Declaration of Donald Hale | 5 | 18 |
| 9-1 | 26-50 | Declaration of Wanda Hale | 6 | 19-42 |
| 9-1 | 51-54 | Declaration of Belinda Harvey | 7 | 43-45 |
| 9-1 | 55-57 | Declaration of George Ray | 8 | 46-47 |
| 9-1 | 58-60 | Declaration of Barbara Smith | 9 | 48-49 |
| 9-1 | 61-63 | Declaration of Jean Smith | 10 | 50-51 |
| 9-1 | 64-66 | Declaration of Alex Wood | 11 | 52-53 |
| 9-1 | 67-69 | Declaration of John Wood | 12 | 54-55 |
| 9-1 | 70-77 | Declaration of Megan Valenzuela | 13 | 56-62 |
| 9-1 | 78-131 | Declaration of Harold Pomeranz | 14 | 63-115 |
| 9-1 | 132-53 | Declaration of Sean Zadig | 15 | 116-36 |
| 9-1 | 154-78 | Declaration of Joshua Bargar | 16 | 137-60 |
| 9-1 | 179-269 | Declaration of Diana Shiller | 17 | 161-250 |
| 9-2 | 3-65 | Declaration of Carol Jones | 18 | 251-312 |
| 9-3 | 1-29 | Declaration of Carol Jones (cont.) | 18 | 313-41 |
| 9-4 | 1-46 | Declaration of Carol Jones (cont.) | 18 | 342-87 |
| 9-5 | 1-139 | Declaration of Carol Jones (cont.) | 18 | 388-526 |
| 9-6 | 1-54 | Declaration of Carol Jones (cont.) | 18 | 527-80 |
| 9-7 | 1-17 | Declaration of Leigh Veillette | 19 | 581-94 |
| 9-8 | 1-22 | Declaration of Leigh Veillette (cont.) | 19 | 595-616 |
| 9-9 | 1-26 | Declaration of Leigh Veillette (cont.) | 19 | 617-42 |
| 9-10 | 1-35 | Declaration of Leigh Veillette (cont.) | 19 | 643-77 |
| 9-11 | 1-35 | Declaration of Leigh Veillette (cont.) | 19 | 678-712 |
| 9-12 | 1-35 | Declaration of Leigh Veillette (cont.) | 19 | 713-47 |

| ECF No. | ECF Pages | Description | PX No. | Exhibit Pages |
|---|---|---|---|---|
| 9-13 | 1-36 | Declaration of Leigh Veillette (cont.) | 19 | 748-83 |
| 9-14 | 1-36 | Declaration of Leigh Veillette (cont.) | 19 | 784-819 |
| 9-15 | 1-36 | Declaration of Leigh Veillette (cont.) | 19 | 820-55 |
| 9-16 | 1-63 | Declaration of Leigh Veillette (cont.) | 19 | 856--918 |
| 9-17 | 1-10 | Declaration of Colleen Robbins | 20 | 971-77 |
| 9-17 | 11-15 | Declaration of Roberto C. Menjivar | 21 | 978-81 |
| 9-17 | 16-22 | Declaration of Calvin Brown | 22 | 982-87 |
| 9-17 | 23-58 | Declaration of Yvonne Shultz | 23 | 988-1022 |
| 9-17 | 59-66 | Declaration of Roshni Agarwal | 24 | 1023-29 |
| 9-17 | 67-71 | Declaration of Jonathan Aid | 25 | 1030-33 |
| 9-17 | 72-74 | Declaration of Jeff Lilleskare | 26 | 1034-35 |
| 9-17 | 75-79 | Declaration of Christine Barker | 27 | 1036-39 |
| 9-18 | 1-217 | Declaration of Reeve Tyndall | 28 | 1040-1255 |
| 33-1 | 1-75 | Second Declaration of Reeve Tyndall | 29 | 1256-1329 |
| 33-2 | 1-45 | Second Declaration of Reeve Tyndall (cont.) | 29 | 1330-74 |
| 33-3 | 1-78 | Second Declaration of Reeve Tyndall (cont.) | 29 | 1375-1452 |
| 33-3 | 79-83 | Second Declaration of Calvin Brown | 30 | 1453-56 |
| 33-3 | 84-88 | Declaration of Richard Kaplan | 31 | 1457-60 |
| 46 | 4-8 | Declaration of Richard Kaplan (PX 31 – refiled) | 31 | 1457-60 |
| 61-1 | 1-71 | Transcript of March 12, 2019 Hearing | 32 | 1461-1530 |
| 61-1 | 72-75 | Declaration of Maria Bazan | 33 | 1531-33 |
| 63-1 | 1-3 | Second Declaration of Maria Bazan | 34 | 1534-35 |
| 63-1 | 4-5 | Declaration of Elsie Kappler | 35 | 1536 |
| 81-2 | 1-51 | Declaration of Harold Pomeranz | 36 | 1537-80 |
| 81-2 | 46-52 | Declaration of Kathleen Fisher | 37 | 1581-86 |
| 81-2 | 53-62 | Declaration of Wesley Fullenwider | 38 | 1587-95 |
| 81-2 | 63-73 | Declaration of Jayden Hales | 39 | 1596-1605 |

| ECF No. | ECF Pages | Description | PX No. | Exhibit Pages |
|---|---|---|---|---|
| 81-2 | 74-78 | Declaration of Brooke Shields | 40 | 1606-09 |
| 81-2 | 79-96 | Declaration of Carl Eckert | 41 | 1610-26 |
| 81-2 | 97-106 | Declaration of Robert Dyer | 42 | 1627-35 |
| 81-2 | 107-13 | Declaration of Arthur Boston | 43 | 1636-41 |
| 81-2 | 114-18 | Declaration of Carol Hackett | 44 | 1642-45 |
| 81-2 | 119-24 | Supplemental Declaration of Roshni Agarwal | 45 | 1646-50 |
| 81-2 | 125-28 | Supplemental Declaration of Jonathan Aid | 46 | 1651-53 |
| 81-2 | 129-34 | Supplemental Declaration of Christine Barker | 47 | 1654-58 |
| 81-2 | 135-38 | Declaration of Calvin Brown | 48 | 1659-61 |
| 81-2 | 139-42 | Declaration of Richard Kaplan | 49 | 1662-64 |
| 81-3 | 1-498 | Declaration of Reeve Tyndall | 50 | 1665-2161 |
| 81-4 | 1-608 | Declaration of Reeve Tyndall (cont.) | 50 | 2162-2769 |
| | | Declaration of Sharon Ball | 51 | 2770-71 |
| | | Declaration of Nicole Vincent Christ | 52 | 2772-73 |
| | | Declaration of Elizabeth Anne Miles | 53 | 2774-75 |

<u>**PRELIMINARY STATEMENT**</u>

Plaintiff, the Federal Trade Commission ("FTC") opposes the motion of Elite IT Partners, Inc. and James Michael Martinos ("Defendants") to vacate the Stipulated Final Order entered by this Court on December 9, 2019 ("ECF 169). As explained further below, Defendants have failed to articulate a basis for relief under Fed. R. Civ. P. 60(b) or set forth any other grounds to vacate or modify the Stipulated Final Order in light of the Supreme Court's ruling in *AMG Capital Management LLC v. FTC*, 141 S. Ct. 1341 (2021). As such their Motion should be denied.

<u>**STATEMENT OF FACTS AND PROCEDURAL HISTORY**</u>

**I.   DEFENDANTS' SCHEME**

The FTC filed its Complaint (ECF 1), along with a Motion for an *Ex Parte* Temporary Restraining Order ("TRO Motion") (ECF 9), on February 25, 2019.[1] In the Complaint and TRO Motion, the FTC alleged that Defendants Elite IT and James Martinos had violated Section 5 of the FTC Act, 15 U.S.C. § 45, the Telemarketing Sales Rule (TSR), 16 C.F.R. Part 310, as amended, and the Restore Online Shopper's Confidence Act (ROSCA), 15 U.S.C. §§ 8401-8405, in their long-running operation of a technical support scam that preyed on thousands of consumers—primarily older adults—causing consumer losses of over $13 million.[2]

The FTC's evidence was overwhelming and unequivocally demonstrated that Defendants' technical support operation was a sham. Their scheme involved drawing

---

[1] The FTC refers throughout this document to portions of pleadings and briefs, and to the supporting exhibits it previously filed. Citations to ECF numbers and pages. In the case of pleadings, briefs, and orders, the FTC also cites to the original document and pages, and where appropriate, paragraph numbers. An index of the FTC's exhibits ("PX") and page ranges, along with corresponding ECF numbers and page ranges can be found at pp. v-vii of this brief.

[2] At the time of the filing, calculated losses were approximately $10.7 million. ECF 9 at 25 (TRO Motion at 20); ECF 9-17 at 59-80, ¶¶ 10-14. After the filing of the TRO Motion, the FTC obtained additional records, which allowed it to make a more precise calculation of $13,537,288.75. ECF 81 at 22; ECF 81-2 at 119-124, ¶¶ 11-14, 126-28.

unsuspecting, vulnerable, and primarily older,[3] consumers to their website using paid search terms.[4] When consumers typed such phrases as "forgot my email password," an advertisement for Elite IT would appear as a prominent search result. After clicking on the result, consumers would be re-directed to one of Elite's webpages offering a "Free, No Obligation PC diagnostic" that stated "EMAIL PROBLEMS? SPEAK TO LIVE AGENT for free!" The webpages requested consumers provide their name, email, and telephone number. After consumers submitted the information, they would receive a call from an Elite sales representative.[5]

Elite's sales pitch was riddled with deception. In every instance—even when consumers had just forgotten their email password—Elite's telemarketers would state that a virus was likely blocking the consumer's access, and that to fix the problem, they needed to access their computer to diagnose and fix the problem.[6]

Once Elite's representatives had access to a consumer's computer they ran a sham "diagnostic,"[7] which they claimed would ensure there were no infections or other issues causing problems with the consumer's computer.[8] The multi-part "diagnostic" included, among other things, running an "anti-spyware" program that identified even harmless tracking cookies as "threats."[9] The representatives told consumers that the "infections" they had identified could be keystroke loggers, which steal data from a computer.[10] They also falsely stated that consumers had no anti-virus protection or that it was not working when their computers were, in fact,

---

[3] ECF 9-1 at 74; ECF 9-17 at 8, 79.
[4] ECF 9-2 at 7; ECF 9-15 at 30.
[5] ECF 9-18 at 3-4.
[6] ECF 9-17 at 7.
[7] *Id.*
[8] ECF 9-1 at 188; 9-18 at 8.
[9] ECF 9-1 at 84; 9-18 at 8.
[10] ECF 9-18 at 8.

protected.[11] Defendants also routinely misrepresented that they were affiliated, or partnered, with well-known technology companies such as AOL, Yahoo, Microsoft, and Verizon.[12]

Defendants' lies were reinforced by scare tactics[13] used to coerce already vulnerable consumers into immediately purchasing "cleanings" usually costing between $149.99 and $249.99,[14] which would purportedly remove the infections on consumers' computers. Elite's telemarketers warned that if consumers did not buy these services, their personal financial information was at risk and could be exposed to hackers and identity thieves.[15]

Using the same scare tactics and misrepresentations, Defendants would upsell technical service plans ranging from $19.99 to $39.99 per month.[16] But the Defendants did not inform consumers of key terms and conditions until they processed consumers' credit cards, including that the service plans were subject to automatic renewal after twelve months unless the consumer cancelled within a prescribed period, and that there was a $150 early cancellation fee.[17]

## II.   LITIGATION AND SETTLEMENT

In support of its TRO Motion, the FTC introduced 28 exhibits, including declarations from multiple injured consumers and their concerned family members; former employees of Elite IT describing the company's deceptive practices; FTC investigators who had recorded telephone and internet interactions with Defendants; an FTC forensic accountant and paralegal who had analyzed the FTC's bank records and calculated consumer harm; and a computer forensics and information security expert who conducted a step-by-step analysis of Defendants'

---

[11] ECF 9-1 at 224.
[12] ECF 9 at 14-16 (TRO Motion at 9-11); 9-1 at 65, 74 135; 9-17 at 79.
[13] ECF 9 at 16-17 (TRO Motion at 11-12); 9-1 at 72, 76, 135.
[14] ECF 9 at 17 (TRO Motion at 12); 9-1 at 134, 156, 174, 191, 195; 9-2 at 12; 9-18 at 9.
[15] ECF 9 at 16-18 (TRO Motion at 11-13); 9-1 at 7, 22, 92.
[16] *See supra* note 14; ECF 9-1 at 147-148.
[17] ECF 9 at 17-18 (TRO Motion at 12-13); 9-1 at 5, 28-30, 53, 59, 62, 65.

"technical support" services and evaluated the representations made by Elite's telemarketers, and concluded that they were a complete sham. *See* ECF 9-1 through 9-19.

The Court found that there was "good cause to believe that Defendants [had] engaged in and [were] likely to engage in acts or practices that violate[d]" Section 5, the TSR, and ROSCA, and that the FTC was "likely to prevail on the merits of this action." *Ex Parte* Temporary Restraining Order ("TRO").[18] Specifically, this Court found that the FTC had "established a likelihood of success in showing that Defendants [had] deceived customers by: (1) misrepresenting that their computers are infected with and unprotected against viruses, and (2) failing to disclose adequately material terms of transactions, including terms relating to Defendants' ongoing technical support services." ECF 15 at 2-3 (TRO at 2-3). This Court further found that "immediate and irreparable harm [would] result from Defendants' ongoing violations of the FTC Act, the TSR, and ROSCA," ECF 15 at 3 (TRO at 3), and that there was "good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers—including monetary restitution, rescission, disgorgement, or refunds— [would] occur from the sale, transfer, destruction, or other disposition or concealment by Defendants of their assets or records, unless Defendants [were] immediately restrained and enjoined …" ECF 15 at 3 (TRO at 3). The Court likewise found that there was good cause, among other things, "for appointing a temporary receiver …," "freezing Defendants' assets, and permitting the FTC and the Receiver[19] immediate access to the Defendants' business premises…." *Id.*

---

[18] ECF 15 at 2 (TRO at 2).
[19] The Court appointed Thomas Barton as Receiver. ECF 15 at 15 (TRO at 15).

At the court-ordered immediate access to the premises, the Receiver and the FTC unearthed more than 1.5 million documents.[20] Among the documents were Defendants' deceptive sales scripts,[21] training notes,[22] recordings of calls with consumers,[23] and other evidence corroborating the FTC's allegations and showing that Defendants had been making false statements to consumers and duping them into buying Elite's services.

Martinos was keenly aware of the damning nature of the materials on the premises. Contrary to explicit instructions from the Receiver and despite the service of the TRO on himself and his counsel, on the day of the immediate access, Martinos absconded with two hard drives that had been in his desk.[24] After his theft came to light and the Receiver contacted his counsel, Martinos returned two hard drives,[25] the contents of one having been modified.[26] The hard drives he returned contained 40 transcripts of deceptive sales calls,[27] demonstrating unequivocally that Martinos knew exactly what his employees were representing to consumers.

On March 12, 2019, the Court issued a notice stating that the preliminary injunction hearing would be held beginning on the morning of April 29, 2019.[28] The FTC filed its Reply to Defendants Martinos' Opposition to the FTC's Motion for an Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Reply") on April 18, 2019.[29]

---

[20] ECF 81-3 at 2.
[21] ECF 81-3 at 4.
[22] See, e.g., ECF 81-3 at 74-78.
[23] ECF 81-3 at 10.
[24] ECF 34 at 9.
[25] ECF 34 at 10. Because Martinos removed the hard drives before the FTC or the Receiver could copy or view their contents, there was no way to confirm that the drives he returned were the same ones he had removed. ECF 33-3 at 82.
[26] ECF 81-2 at 142.
[27] ECF 81-3 at 11.
[28] ECF 45. The TRO was extended four times leading up to this hearing. See ECF 47, ECF 59, ECF 72-73, and ECF 93.
[29] ECF 81.

Defendants had ample time to marshal the evidence in advance of, and prepare for, the hearing. But in the face of overwhelming evidence of their deceptive practices, and just one day after the Court issued an order regarding the presentation of witnesses and other evidence at the hearing,[30] Defendants, represented by competent counsel, agreed to a preliminary injunction, which the FTC filed with this Court on Friday, April 26, 2019.[31]

The Court entered the Stipulated Preliminary Injunction on May 6, 2019 ("Stipulated PI").[32] Under the Stipulated PI, Defendants were able to continue their business-to-business technical support operations, as these were never the subject of the FTC's Complaint.[33] However, the receivership and asset freeze remained in place.[34]

After extensive negotiations in which Defendants were again represented by competent counsel, the parties stipulated to a proposed final order, which would impose a suspended judgment, meaning that Defendants' payment obligations were limited to available assets, as attested to by Martinos, and allow him to continue to engage in business-to-business technical support activities. On September 20, 2019, the parties jointly moved to stay the proceedings pending the Commission's consideration and approval of the settlement,[35] and on November 21,

---

[30] ECF 97.
[31] ECF 100. This Court concurrently vacated the preliminary injunction hearing scheduled for the following Monday. ECF 99.
[32] ECF 104.
[33] Under the Stipulated PI, Defendants were barred from billing or charging consumers for "Technical Support Products or Services," which included only technical support services provided under the name "Elite IT Home" – Defendants' consumer-facing business. ECF 104 at 5-6 (Stipulated PI at 5-6).
[34] ECF 104 at 7-11–15-20 (Stipulated PI at 7-11–15-20).
[35] ECF 135.

2019, the FTC submitted the Stipulated Order to this Court for its approval.[36] The Court entered

the Stipulated Order on December 9, 2019.[37]

### III.   CONSUMER REDRESS

Part VI.A of the Stipulated Judgment imposed a monetary judgment of $13,537,288.75

jointly and severally against Elite and Martinos. This amount represented the calculated

consumer losses (revenues less refunds and chargebacks) from Elite's deceptive technical

support operations.[38] However, the judgment was suspended based on Martinos' sworn

representations regarding Elite's and his assets and ability to pay the full amount of the

judgment. ECF 150 at 6-8 (Stipulated Order, Part VI). The judgment also limited the required

payments to frozen funds in the name of Elite IT and Martinos in the custody of third parties

(Think Mutual Bank, Wells Fargo Bank, and Vanguard Group, Inc.), and a payment of $173,500

drawn on Martinos' home equity line of credit with Think Mutual Bank.

Defendants incorrectly state that "the judgment has never been satisfied,"[39] implying that

collection efforts by the FTC continue. In fact, Martinos and Elite have fully satisfied the non-

suspended payment requirements under Part VI, and the full amount of the judgment would be

due only if the FTC discovers that Martinos "failed to disclose any material asset, materially

misstated the value of any asset, or made any other material misstatement or omission in [his]

financial representations…." *See* ECF 150 at 7 (Stipulated Order, Part VI.I-J).

Defendants also misstate, and make unsupported assertions about, the amounts actually

paid to the FTC under the Stipulated Order. The FTC did not—as Defendants claim—receive

---

[36] ECF 144, 144-1.
[37] ECF 150.
[38] ECF 81-2 at 124, 128.
[39] *See* ECF 169 at 9 (Motion at 4).

$1.2 million.[40] Instead, it received only $355,138.80.[41] The $355,138.80 collected was the total amount available for redress to consumers and the cost of administering redress.[42] The FTC used these funds to administer redress, sending checks of $9.43 each to 31,075 injured consumers.[43] But the amount distributed in total or individually was not—as Defendants assert—"the FTC's estimation" of "the actual loss incurred" by consumers.[44] In fact, the $355,138.80 collected and available for redress was a mere 2.6% of the actual consumer losses captured by the full monetary judgment of $13,537,288.75. And the FTC issued checks of $9.43 (less than each consumer's total loss) to compensate as many victims as possible.[45]

The FTC's collection, maintenance, and distribution of funds has been consistent with the parties' agreement, which provided that the "money paid to the Commission … may be deposited into a fund administered by the Commission or its designee to be used for equitable relief, including consumer redress and any attendant expenses for the administration of any redress fund," and that money not used for such equitable relief" was "to be deposited in the U.S. Treasury as disgorgement."[46] ECF 150 at 8 (Stipulated Order, Part VII.E). And Defendants expressly agreed that they would "have no right to challenge any actions the Commission or its

---

[40] Defendants incorrectly state that "the receiver liquidated [Elite IT's] assets and paid more than $1,000,000 towards the judgment." ECF 169 at 9 (Mot.at 4). As shown above, the Receiver's payments to the FTC on behalf of the corporation were only $138,465.17. PX51 (Declaration of Sharon Ball), ¶ 3 (see payments on September 3 and 8, 2020).

[41] *Id.*, ¶ 3.

[42] PX52 (Declaration of Nicole Vincent Christ), ¶ 6.

[43] PX52, ¶ 8. The FTC disbursed $349,112.65 to the FTC's redress administrator, Analytics Consulting, LLC, $293,037.25 of which was distributed to consumers, and $56,075.40 of which was a fee to Analytics Consulting for the administration of redress. $6,026.15 has been temporarily kept in reserve for additional administrative expenses. PX51, ¶ 4.

[44] ECF 169 at 9 (Mot. at 4); PX53 (Declaration of Elizabeth Anne Miles), ¶ 9.

[45] PX52, ¶¶ 7-8; PX53, ¶ 9.

[46] Redress efforts continue. PX52, ¶ 8. No funds have been disgorged to the U.S. Treasury, PX51, ¶ 5, and the FTC anticipates that the small reserve of $6,026.15 will be paid to the redress administrator. PX52, ¶ 9.

representatives" took pursuant to Section VII.E of the Stipulated Order. ECF 150 at 9 (Stipulated Order, Part VII.E).

## **ARGUMENT**

Defendants have failed to articulate any grounds to vacate or modify the Stipulated Final Order in light of the Supreme Court's ruling in *AMG Capital Management LLC v. FTC*, 141 S. Ct. 1341 (2021). *AMG* does not have retroactive effect on closed cases, Defendants waived their rights to challenge the Stipulated Final Order entered in 2019, relief is not warranted under either Rule 60(b)(5) or 60(b)(6), *AMG* did not alter the FTC's ability to obtain injunctive relief, and the monetary relief is supported by Section 19 as pled in the Complaint. As such, Defendants' Motion should be denied.

### I.   SUPREME COURT RULINGS DO NOT HAVE A RETROACTIVE EFFECT ON CLOSED CASES

Based on the Supreme Court's ruling in *AMG Capital Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021), Defendants now move to set aside and vacate the Stipulated Final Order they negotiated in 2019. ECF 169. It is well settled, however, that Supreme Court rulings have retroactive effect only on "cases still open on direct review." *See Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 97 (1993); see also *James B. Beam Distilling Co. v. Georgia.*, 501 U.S. 529, 541 (1991) ("[R]etroactivity in civil cases must be limited by the need for finality; . . . a new rule cannot reopen the door already closed.") (internal citations omitted); *Strope v. Cummings*, 653 F.3d 1271, 1274 (10th Cir. 2011) ("a new pronouncement must be given full retroactive effect [only] in all cases still open on direct review") (alteration in original)).

Defendants agreed to settle this matter through a Stipulated Final Order over a year before *AMG* was decided. ECF 144-1, 150, and 153. This case was closed for over a year before Defendants filed their motion. ECF 153, 169. Because this case is not open on direct review, the

ruling in *AMG* provides no basis for relief in this case. *See, e.g. FTC v. Ivy Capital, Inc.*, 2:11-CV-283, 2022 WL 706507, at *2 (D. Nev. Mar. 9, 2022) (unpublished) (court held that, absent extraordinary circumstances, the AMG decision does not retroactively apply to movant's closed case under Rule 60(b)(6)). Accordingly, Defendants' motion must be denied.

## II.    DEFENDANTS WAIVED ANY RIGHT TO CHALLENGE THE STIPULATED FINAL ORDER

Defendants agreed to relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to the Stipulated Final Order, and they agreed that they may not seek return of any assets. ECF 150 at 8. They also waived "all rights to appeal or otherwise challenge or contest the validity" of the Stipulated Final Order. ECF 150 at 2. Because Defendants waived any right to relief and any right to challenge the Stipulated Final Order, their motion must be denied.

## III.    RELIEF IS NOT WARRANTED UNDER RULE 60(b)(5)

Under Rule 60(b)(5), a court may relieve a party from a final judgment if "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). This rule does not apply to monetary judgments, there was no misunderstanding of the law when the parties signed the Stipulated Final Order, and a change in the law does not warrant relief.

### A.    Rule 60(b)(5) Does Not Apply to Money Judgments, Whether or Not Paid

Defendants seek relief from this Court's monetary judgment under the prospective application prong of the Rule only.[47] Because monetary judgments are not prospective, Rule 60(b)(5) is not a means to vacate them. *See U.S. v. Melot*, 712 F. App'x. 719, 721 (10th Cir. 2017) (money judgments do not meet the definition of a prospective judgment); *FTC v. Apex*

---

[47] ECF 169 at 10 (Mot. at 5).

*Capital Grp.*, CV 18-9573-JFW(JPRx), 2021 WL 7707269, at *3 (C.D. Cal. Sept. 3, 2021)

(unpublished) (Rule 60(b)(5) is inapplicable because it applies to prospective injunctive relief,

not equitable monetary relief); *FTC v. John Beck Amazing Profits, LLC*, CV 9-4719, 2021 WL

4313101, at *3 (C.D. Cal., Aug. 19, 2021) (unpublished) (same); *Ivy Capital*, 2022 WL 706507,

at *5 (same). Defendants argue that the Stipulated Final Order they agreed to is prospective

because of the suspended judgment. However, monetary judgments (paid or unpaid) are not

"prospective" simply because they have continuing consequences:

> Virtually every court order causes at least some reverberations into the future, and
> has, in that literal sense, some prospective effect; even a money judgment has
> continuing consequences, most obviously until it is satisfied, and thereafter as well
> inasmuch as everyone is constrained by his or her net worth. That a court's action
> has continuing consequences, however, does not necessarily mean that it has
> "prospective application" for the purposes of Rule 60(b)(5).

*Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C. Cir. 1988). An order

provision only has "prospective application" under Rule 60(b)(5) if it is "executory" or involves

"the supervision of changing conduct or conditions." *Melot*, 712 F. App'x at 721, *(quoting*

*Twelve John Does*, 841 F. 2d at 1138-39). A money judgment remedies past wrongs; it is not

executory nor does it require the court to supervise any changing conditions. *Melot*, 712 F.

App'x at 721; *FTC v. Ah Media Grp., LLC*, 339 F.R.D. 612, 618-19 (N.D. Cal. 2021) (finding

stipulated orders that contained a suspended judgment lacked prospective effect and provided no

basis for relief under Rule 60(b)(5)); *FTC. v. Nat. Urological Group, Inc.*, 1:04-CV-3294, 2021

WL 5774177 at *2-3 (N.D. Ga. 2021) (unpublished) (Defendants did not meet standard for relief

under 60(b)(5) as monetary judgments are not prospective).

Defendants cite to no authority for their proposition that their Stipulated Final Order is

prospective, and they appear to misunderstand the provisions of the order and the actions that

trigger the suspended judgment. The injunctive provisions Defendants reference in the Stipulated

11

Final Order, XIII (Compliance Reporting), XIV (Recordkeeping), and XV (Compliance Monitoring), are not contingent on the monetary provisions and would not be rendered moot if there were no suspended judgment. These provisions require Defendants to provide business information and compliance reports to the FTC so that the FTC is able to monitor whether Defendants are violating the order and the law. Moreover, as discussed more fully below, *AMG* did not take away the FTC's authority to obtain injunctive relief. *See infra* Section V.

Despite Defendants protestations that the monetary judgment "hovers over Mr. Martinos' head like a guillotine—ready to drop at the FTC's whim," the monetary judgment has been satisfied and can *only* be reopened if Martinos lied in his sworn financial statements.

Moreover, even an unpaid monetary award is not prospective for purposes of Rule 60(b)(5). *See Melot*, 712 F. App'x at 721 (affirming that relief from judgment unavailable under Rule 60(b)(5) because unpaid money judgment that accrued interest is not prospective); *Stokors S.A. v. Morrison*, 147 F.3d 759, 762 (8th Cir. 1998) (concluding "that Rule 60(b)(5)'s equitable leg cannot be used to relieve a party from a money judgment"); *see also Apex Capital Grp.*, 2021 WL 7707269, at *3 (*quoting* 12 Moore's Federal Practice - Civil § 60.47[1][b] (2021) ("Even if the judgment debtor has not yet paid the judgment … it is not 'prospective,' since it is not executory and involves no judicial supervision of changing conduct or conditions"); *see also Colon v. Berryhill*, No. 15-cv-00834, 2019 WL 5305469, at *7 (W.D.N.Y. Oct. 21, 2019) (unpublished) (holding that judgment ordering payment that had not yet been calculated still did "not have 'prospective application' within the meaning of Rule 60(b)(5)"). In short, a monetary judgment, even unpaid, is not prospective, and Rule 60(b)(5) does not apply in this case.

### B.  The Parties Did Not Misunderstand the Law

Defendants rely on *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) to argue that enforcement of the judgment is no longer equitable because the parties' agreement was

based on a "misunderstanding of the governing law."[48] *Rufo* involved a consent decree providing for a new Massachusetts jail and single occupancy cells for inmates. *Rufo*, 502 U.S. at 375-76. The Supreme Court held that a party seeking modification of an institutional reform consent decree must establish that a significant change in facts or law warrant revision of a decree and the proposed modification must be suitably tailored to the circumstances. *Id*. at 384. Specifically, under *Rufo*, a change in law could justify Rule 60(b)(5) relief in three circumstances: (1) "one or more of the obligations placed upon the parties has become impermissible under federal law," 502 U.S. at 388; (2) the "law has changed to make legal what the decree was designed to prevent," *id.*; or (3) "the parties based their agreement on a misunderstanding of the governing law." *Id*. at 390; *see also Nobels v. Sec. Fin. Corp. of Ga.*, 431 F. App'x 835, 840-41 (11th Cir. 2011) (summarizing changed factual or changed legal circumstances that could warrant modification of a consent decree). Rule 60(b)(5) does not allow relief when "it is no longer convenient to live with the terms of a consent decree." *Rufo*, 502 U.S at 383.

Even assuming that monetary judgments are prospective (they are not) and thus within the scope of Rule 60(b)(5), *Rufo* still renders the change in law irrelevant. Defendants appear only to rely on the third circumstance listed in Rufo: "agreement on a misunderstanding of the governing law." ECF 169 at 10 (Mot. at 5).[49] However, Defendants cannot prove that both

---

[48] ECF 169 at 10-11 (Mot. at 5-6).

[49] To be clear, the other two circumstances are also inapposite. First, monetary obligations have not become impermissible under federal law. In fact, it remains permissible for a defendant to accept a monetary obligation consensually (for instance, in lieu of more onerous injunctive provisions). *See*, *e.g.*, *United States v. Witco Corp.*, 76 F. Supp. 2d 519, 528-29 (D. Del. 1999) (rejecting Rule 60(b)(5) motion to modify consent decree providing for certain expenses despite Supreme Court case eliminating agency's ability to recover such expenses under operative law). While the FTC may no longer obtain restitution under Section 13(b) at trial, settlements containing monetary obligations have not become unlawful. *See id*. at 529 (the Supreme Court decision does not prohibit the EPA from collecting costs as a term of a settlement agreement).

parties to the Stipulated Final Order misunderstood the governing law. *See Rufo*, 502 U.S. at 390; *see also Nobels*, 431 F. App'x at 845 (affirming refusal to modify when movant failed its "burden to point to record evidence to establish that the parties misunderstood the law at the time of their settlement and that such misunderstanding was a factor in the settlement").

In fact, in April 2021, sixteen months after Defendants stipulated to a final judgment, *AMG* reversed decades of settled law in the Tenth Circuit and nationwide that permitted monetary relief under Section 13(b). *See, e.g., FTC v. Zurixx*, 441 F. Supp 3d 1216, 1221 (D. Utah 2020) ("Until *Credit Bureau*, every court of appeals that considered whether Section 13(b) authorizes monetary relief agreed that it did."); *FTC v. LoanPointe, LLC*, 525 F. App'x 696, 699 (10th Cir. 2013); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 n.6 (10th Cir. 2005). Under this precedent, the FTC relied on Section 13(b), in addition to Section 19, in seeking to recover funds for Defendants' many victims. Defendants negotiated and signed the Stipulated Final Order requiring a monetary judgment and never once argued during litigation that the Court did not have the authority to grant monetary relief. *See* ECF 26 (Motion to limit Receiver's authority), 49 (Motion for release of funds), and 67 (Opposition to PI). None of the circumstances in which *Rufo* permits relief based on a change in law exists.

### C. Defendants Cannot Establish That the Change in Law Warrants Rule 60(b)(5) Relief

If the Court finds that Defendants could somehow establish that the Final Order's monetary judgment is prospective and that the judgment qualifies under *Rufo*, that *still* "does not ensure success under Rule 60(b)(5)." *Evans v. Fenty*, 701 F. Supp. 2d 126, 156 (D.D.C. 2010)

---

Second, the law did not change "to make legal" what the monetary judgment Defendants contest "was designed to prevent." *See Rufo*, 502 U.S. at 388. Indeed, this potential basis for Rule 60(b)(5) relief makes no sense when applied to a money judgment because, as discussed above, money judgments are not prospective obligations.

(citing *Rufo*, 502 U.S. at 384). The Defendants must show that "a significant change either in factual conditions or in law" warrants revision of the Stipulated Final Order. *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1194 (10th Cir. 2018) (*citing Rufo*, 502 U.S. at 384). Courts have held that a change in precedential law by itself rarely supports relief under Rule 60(b)(5). *Sperry v. Werholtz*, 04-cv-3125, 2007 WL 3293276 at \*3 (D. Kan. 2007) (unpublished); s*ee also Dowell v. State Farm Fire and Casualty Automobile Ins. Co.*, 993 F.2d 46, 48 (4th Cir. 1993) (affirming district court ruling that a decisional change in the law subsequent to a final judgment does not provide a sufficient basis for vacating the judgment under Rule 60(b)(5)). Defendants cite to a change in precedential law for justification for their relief sought,[50] and, as such, the Court should deny their request to vacate the Stipulated Final Order.[51]

## IV.    RELIEF IS NOT WARRANTED UNDER RULE 60(b)(6)

Rule 60(b)(6) allows a court to set aside a final judgment for any reason that justifies relief from the operation of the judgment. Fed. R. Civ. P. 60(b)(6). However, relief is warranted only in exceptional circumstances and when necessary to accomplish complete justice. *Cashner v. Freedom Stores*, 98 F.3d 572, 579 (10th Cir. 1996); *Van Skiver v. United States*, 952 F.2d

---

[50] Defendants cite to *Zimmerman v. Quinn*, 744 F.2d 81, 83 (10th Cir. 1984), to illustrate the court may modify a consent order when it is no longer equitable. In *Zimmerman*, the parties agreed one party would pay the tax liability for a transfer of interests that should have occurred within 30 days. *Zimmerman*, 744 F.2d at 82. That transfer was delayed for nearly two years. *Id*. The court found that it was inequitable to force the party to pay taxes it was never supposed to pay under the order. *Id*. at 83. In this case, Defendants are not arguing a change in circumstance that renders the Stipulated Final Order inequitable (and there are none); merely a change in law.
[51] If the Court finds that Defendants have met their burden of showing exceptional circumstances under *AMG* alone, the Defendants must propose a modification that is suitably tailored to the changed circumstances. *Rufo*, 502 U.S. at 384. As noted above, *AMG* does not affect the FTC's ability to obtain injunctive relief and Section 19 allows the FTC to also seek monetary relief. Thus, Defendants' request to vacate the order and return the case to the Court's docket for trial, ECF 169 at 21 (Mot. at 16), is decidedly not suitably tailored to the change in law.

1241, 1243-45 (10th Cir. 1991). Relief is unwarranted when Defendants consciously decided to settle this case, there is merely a change in the law, and Defendants regret their decision.

### A. Defendants Chose to Settle and Rule 60(b)(6) Does Not Apply

Rule 60(b)(6) does not apply in this case because Defendants made a deliberate choice to settle with the FTC. The Tenth Circuit has held that negotiated Stipulated Final Orders are not to be set aside easily and these types of judgments are as final as those resulting from trial. *VTA, Inc. v. Airco*, 597 F.2d 220, 226 (10th Cir. 1979) (reversing 60(b) relief noting that if the Court were to affirm the relief, it would "upset the delicate balance between the finality of judgment and justice that Rule 60(b) seeks to maintain."). Moreover, Rule 60(b)(6) "is not for the purpose of relieving a party from free, calculated and deliberate choices he has made. A party remains under a duty to take legal steps to protect his own interests." *Cashner*, 98 F.3d at 580, (quotation omitted); *Johnson v. Spencer*, 950 F.3d 680, 703 (10th Cir. 2020) ("the sort of 'free, calculated, and deliberate choices' that may undermine a party's request for Rule 60(b)(6) relief are things like settlement agreements that have not worked out for the party").[52] Thus, Defendants' deliberate choice to settle should not form the basis to vacate a judgment.[53]

---

[52] *See also SEC v. Ahmed*, 15-cv-13042, 2021 WL 916266, at *4 (D. Mass. Mar. 10, 2021) (unpublished) (court will not permit Defendants to relitigate a negotiated settlement agreement and unwind it after the fact after the Supreme Court's decision in *Liu* merely because such a post-settlement development materialized); *Apex Capital Grp.*, 2021 WL 7707269, at *4 (court denied Rule 60(b)(6) relief when Defendants settled the case and freely entered into the judgment and noted that Defendants cannot be relieved of those decisions simply because they now seem ill conceived); *see also Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1490-91 (10th Cir. 1994) (upholding district court's denial of Rule 60(b)(6) motion when there was a change in relevant case law and Merrill Lynch waived its right to compel arbitration).

[53] At the time Defendants signed the Stipulated Final Order, the Seventh Circuit already issued its ruling in *FTC v. Credit Bureau Center*, LLC, 937 F.3d 764, 767 (7th Cir. 2019) that Section 13(b) does not authorize monetary relief. This ruling upended decades of well settled precedent in nearly every circuit in the country. *See Zurixx*, 441 F. Supp. 3d at 1221. Defendants settled this case despite this ruling having created a circuit split, and their request to vacate or modify

### B.  A Change in Law is Not an Extraordinary Circumstance under Rule 60(b)(6) in This Case

Defendants argue *only* that the change in the law imposed by *AMG* warrants 60(b)(6) relief. In the Tenth Circuit, Rule 60(b)(6) relief is "even more difficult to attain and is appropriate only when it offends justice to deny such relief." *Zurich North America v. Matrix Service, Inc.*, 426 F.3d 1281, 1293 (10th Cir. 2005). The Tenth Circuit has sometimes found that Rule 60(b)(6) relief may be applicable when extraordinary circumstances exist from events not contemplated by the moving party after entry of the judgment that renders enforcement of the judgment inequitable. *Cashner*, 98 F.3d at 579.[54] However, just as with Rule 60(b)(5), a change in law is not considered extraordinary relief justifying relief under Rule 60(b)(6) in the Tenth Circuit. *Collins v. City of Wichita*, 254 F.2d 837, 839 (10th Cir. 1958) ("a change in the law or in the judicial view of an established rule of law is not such an extraordinary circumstance which justifies relief"); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.*, 962 F.2d 1528, 1535 (10th Cir. 1992) (confirming "the *Collins* holding is still the rule in this circuit"); *Cox v. Horn*,

---

the order should be denied. *See Saggiani v. Strong*, 718 F. App'x 706, 711 (10th Cir. 2018) (denying relief under Rule 60(b)(6) because all the relevant facts were available to movant when he elected not to investigate or object to the settlement motion); *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1194 (10th Cir. 2018) (modification should be denied where a party relies on events actually anticipated at the time it entered the order).

[54] Defendants erroneously characterize the Tenth Circuit's holdings under Rule 60(b)(6) by stating the "rule simply requires an unexpected turn of events that makes the original judgment unjust." ECF 169 at 15 n.2 (Mot. at 10 n.2)). Defendants cite to *State Bank v. Gledhill*, 76 F.3d 1070 (10th Cir. 1996). The court in *Gledhill* agreed, on an appeal, that converting the case from Chapter 11 to Chapter 7, the increase in property value, and the likelihood that more money could be distributed to creditors constituted exceptional circumstances under Rule 60(b)(6). *Id*. at 1081. Defendants seem to conflate a change in the law with a change in circumstance; they cite to no exceptional circumstances warranting relief. Defendants also cite to *Liljeberg v. Health Servs. Acquisiton Corp*., 486 U.S. 847 (1988), pointing to factors for determining whether an extraordinary circumstance exists. ECF 169 at 13 (Mot. at 8). But those factors appear limited to § 60(b)(6) motions based on violations of 28 U.S.C. § 455(a), which is inapposite here. *See Liljeberg,* 486 U.S. at 864.

757 F.3d 113 (3d Cir. 2014) (holding "jurisprudential change rendered by *Martinez*, without more, does not entitle a habeas petitioner to Rule 60(b)(6) relief").[55]

Defendants cite to *Adams v. Merrill Lynch, Pierce, Fenner & Smith*, 888 F.2d 696 (10th Cir. 1989) for the proposition that a change in law by the Supreme Court warrants relief under Rule 60(b)(6).[56] *See* ECF 169 at 13 (Mot. at 8). However, the Tenth Circuit has also held the opposite. In *Metz*, the Tenth Circuit acknowledged the holding in *Adams*, noting that it cited *Pierce v. Cooke & Co.*, 518 F. 2d 720, 722-24 (10th Cir. 1975), and compared those cases with Tenth Circuit authority holding the opposite. *Metz*, 39 F.3d at 1491 n. 9. In *Van Skiver*, the Tenth Circuit noted that *Pierce* was extraordinary because there was a post-judgment change in the law arising out of the same accident as that in which the plaintiffs were injured. *Van Skiver*, 952 F.2d at 1244-45. More recently, the Tenth Circuit held that when a post judgment change in law does not arise in a related case, a change in the law does not justify relief.[57] *Ross v. Bush*, 704 F. App'x 771, 773 (10th Cir. 2017) (*citing Van Skiver*, 952 F.2d at 1245).

---

[55] Defendants cite to *Cox* for the proposition that major substantive changes warrant an exception to finality. However, the Third Circuit made clear in that case that "courts must heed the Supreme Court's observation—whether descriptive or prescriptive—that Rule 60(b)(6) relief in the habeas context, especially based on a change in federal procedural law, will be rare." *Id*. at 125. And, for relief to be granted, much more than even "the concededly important change of law" in that case would be required. *Id*. at 115, 124. The Third Circuit reversed an order denying relief so that the trial court could consider how, if at all, the capital nature of the case or other factors figured into the analysis. *Id*. at 124.

[56] In *Adams*, the case was on appeal and not subject to a final determination. *Adams*, 888 F.2d at 697. Defendants also cite to *Wilson v. Al McCord, Inc.*, 858 F.2d 1469 (10th Cir. 1988), but this case was also pending appeal at the time of the change in state law which made it necessary for the court to remand for trial so that the parties could more fully develop the factual record. *Wilson*, 858 F.2d at 1479. In this case, the settlement was finalized over a year prior to the ruling in *AMG*.

[57] Defendants cite to *Johnson v. Spencer*, 950 F.3d 680 (10th Cir. 2020) stating that the court remanded the case for reconsideration based on a change in Supreme Court precedent. ECF 169 at 13 (Mot. at 8). This is incorrect. In the context of analyzing a Rule 60(b)(4) argument, the court stated that a recent Supreme Court decision did nothing to disturb civil judgments entered

The *Adams* holding has also been criticized. The Supreme Court of Colorado noted, *Adams* was "clearly erroneous and inconsistent with the vast majority of existing federal case law." *Davidson v. McClellan*, 16 P.3d 233, 237 n.8 (Colo. 2001) (citation omitted). Significantly, one treatise characterized the narrow line of authority to which *Adams* belongs as "clearly erroneous." 12 Moore's Federal Practice - Civil § 60.48 nn.53, 54 & accompanying text (2021).

### C.  Buyer's Remorse Is Not An Extraordinary Circumstance

Defendants argue that they would not have settled this case but for the injunction they were under, ECF 169 at 17 (Mot. at 12), and the FTC should not have obtained that relief in 2019 because the law changed in 2021. First, as noted above, it was well settled precedent at the time the FTC filed this case that Section 13(b) allowed monetary relief and the attendant equitable relief. *See supra* Section III.B. Second, as described more fully below, the 2021 *AMG* decision does not restrict the FTC's ability to obtain injunctive relief under Section 13(b), and it does not restrict the FTC's ability to obtain redress and attendant equitable relief under Section 19 for its allegations of violations of the TSR and ROSCA. *See infra* Section V.

Third, Defendants made a conscious decision to settle. They stipulated to the preliminary injunction on the eve of the hearing.[58] They made the conscious decision to forgo a hearing where both parties were expected to call witnesses and present evidence.[59] Then, Defendants agreed to a Stipulated Final Order in lieu of litigating this case and agreed to waive their right to

---

under a prior understanding of the statute where those judgments were final. *Id*. at 696. Under its Rule 60(b)(6) analysis, the Tenth Circuit found that the lower court based its denial of Rule 60(b)(6) relief on an erroneous view of the law that such relief was only available in equitable actions and remanded back to the lower court without taking any view on the appropriate outcome. *Id*. at 702-03.

[58] ECF 99, 100.

[59] See, e.g., ECF 97.

appeal.[60] Now that the law has changed, they want to unwind a settlement to re-victimize the consumers they harmed through their deception by taking money from them—yet again.[61]

As the Tenth Circuit has stated, Rule 60(b)(6) is not for the purpose of relieving a party from free, calculated, and deliberate choices. *Cashner*, 98 F.3d at 580 (reversing district court's granting of relief under Rule 60(b)(6) finding nothing sufficiently unusual or compelling about making a bad bargain to warrant relief); *see also Kile v. United States*, 915 F.3d 682, 688 (10th Cir. 2019) ("even if the settlement upon which the parties agreed constituted a bad deal in hindsight, there is nothing sufficiently unusual or compelling about making a bad bargain to warrant relief under Rule 60(b)(6).).") (citations omitted).[62]

## V.   *AMG* DID NOT ALTER THE FTC'S AUTHORITY TO OBTAIN INJUNCTIVE OR MONETARY RELIEF IN THIS CASE

### A.   The FTC Retains Statutory Authority to Obtain Injunctive Relief

The FTC's authority to seek and obtain injunctive relief under Section 13(b) was reaffirmed by the Supreme Court in *AMG*, 141 S. Ct. at 1346-47 (recognizing a court may issue a "permanent injunction" pursuant to Section 13(b)); *FTC v. Am. Future Sys., Inc.*, 2021 WL 3185777, at *1 n.1 (E.D. Pa, July 26, 2021) (unpublished) (finding that *AMG* did not affect the ability for the FTC to seek or obtain a preliminary or permanent injunction); *FTC v. Neora, LLC*, 2021 WL 3398153, at *3-5 (N.D. Tex. Aug. 2, 2021) (unpublished) (finding that the "FTC

---

[60] ECF 150.

[61] ECF 169 at 21 (Mot. at 16).

[62] *Coltec Indus. v. Hobgood*, 280 F.3d 262, 273, 276 (3rd Cir. 2002) (affirming denial of Rule 60(b)(6) relief and stating "[i]n retrospect in light of the Supreme Court's decision in Eastern, Coltec may wish that it had not made this deal, but courts have not looked favorably on the entreaties of parties trying to escape the consequences of their own counseled and knowledgeable decisions") (citations omitted); *FTC v. Ah Media Grp., LLC*, 339 F.R.D. 612, 619 (N.D Cal. 2021) (denying relief under Rule 60(b)(6) noting that Defendants' choice to stipulate to all relief was a risk, but Defendants cannot be relieved of their choice because hindsight, in light of *AMG*, indicates their decision not to litigate was wrong).

[does] not need to obtain a prior preliminary injunction or temporary restraining order via the administrative process prior to seeking a permanent injunction under Section 13(b)").

Accordingly, the permanent injunction in the Stipulated Final Order is wholly unaffected by *AMG*. Other than the monetary judgment and its ancillary provisions in Section VI, VII, and IX, the remaining provisions in the Final Order are inherently injunctive. *See* ECF 150.[63] The Court retains its authority to order these injunctive provisions under Section 13(b), which all work to ensure that Defendants do not resume their deceptive practices.

### B.  The FTC Retains Authority Under Section 19 to Obtain Monetary Relief

Throughout this case, the FTC pursued relief for Defendants' violations of the TSR and ROSCA under Section 13(b) and under Section 19. Section 19 is an independent basis on which the FTC may sue for violations of rules such as the TSR and statutes such as ROSCA,[64] 15 U.S.C. § 57b(b), and courts may award relief "necessary to redress injury to consumers" for those violations. 15 U.S.C. § 57b(b). The *AMG* decision did not affect the FTC's rights under Section 19. *FTC v. Cardiff*, 2021 WL 3616071, at *2 (C.D. Cal. 2021) (unpublished) (post-AMG decision where court stated that Section 19 "plainly authorizes the FTC to seek equitable monetary relief to redress consumer injury resulting from ROSCA violations").

---

[63] Section I (ban on technical support products or services); Section II (ban relating to negative option features); Section III (prohibition against misrepresentations); Section IV (prohibition concerning telemarketing); Section V (prohibitions concerning refunds and cancellations); Section VIII (handling of customer information); Section X (receivership); Section XI (cooperation); Section XII (order acknowledgments); Section XIII (compliance reporting); Section XIV (recordkeeping); XV (compliance monitoring)).

[64] Section 19(a)(1) provides: "[i]f any person, partnership, or corporation violates any rule under this subchapter respecting unfair or deceptive acts or practices . . . then the Commission may commence a civil action against such person, partnership, or corporation for relief under subsection (b)… ." (emphasis added). 15 U.S.C. § 57b(a)(1). Under 15 U.S.C. § 8404(a), violations of ROSCA are treated as violations of rules under Section 18 of the FTC Act (15 U.S.C. § 57a).

Defendants' statement that "the FTC relied solely on Section 13 for disgorgement and non-redress monetary relief," ECF 169 at 20, is simply incorrect. The FTC cited Section 19 in Paragraph 1 of its Complaint, included TSR and ROSCA counts under Section 19 in its Complaint (Count III – TSR; Count IV – ROSCA), and cited Section 19, the TSR, and ROSCA in its prayer for relief, expressly requesting, among other things, the very relief outlined in Section 19(b), 15 U.S.C. § 57b(b), that is, such relief "necessary to redress injury to consumers resulting from" Defendants' violations of the TSR and ROSCA." ECF 1 at 24-25 (Complaint at 24-25). The FTC also addressed its TSR and ROSCA counts in its TRO Motion and Reply, and submitted voluminous evidence with these filings, showing that *every* telemarketing call made by Elite violated the TSR, and *every* upsell of a service contract violated ROSCA, and that the FTC was entitled to relief for the TSR and ROSCA violations under Section 19.[65] In addition, the Stipulated Final Order incorporated the TSR and ROSCA counts into its text and injunctive provisions, which include a finding that Defendants violated the TSR and ROSCA, a ban on selling products or services with negative option features, and a prohibition on violating the TSR.

Defendants rightly state that Section 19 permits only non-punitive awards that "redress injury to consumers," ECF No. 169 at 20 (Mot. at 15), but here, the *entire* sum collected—a tiny percentage of the actual harm Defendants caused consumers—has been devoted to redress and redress administration,[66] and to date, *no* funds have been disgorged to the Treasury.[67] Even if the monetary judgment were capped at the gross receipts less chargebacks and refunds for the three-years prior to the filing of the Complaint (within Section 19's limitations period), the calculated

---

[65] ECF 9 at 30 (TRO Motion at 25); ECF 81 at 17-20 (Reply at 11-14).
[66] PX52, ¶¶ 8-9.
[67] PX51, ¶ 5.

harm would be nearly $9.5 million[68] and the meager sum collected from Defendants would not come close to redressing consumer harm.[69]

### C.  The Preliminary Injunctive Relief Was Necessary to Protect Consumers and Ensure an Adequate Amount of Funds for Redress

Defendants attempt to unwind the entire case based on a "tainted process" is both unconvincing and unavailing. ECF No. 169 at 18 (Mot. at 13). The preliminary relief provided by this Court in granting the FTC's TRO Motion, and which was subsequently stipulated to by Defendants, was legally permissible at the time and appropriate given the facts. *See, e.g., Villescas v. Abraham*, 285 F. Supp. 2d 1248, 1254 (D. Colo. 2003) (when deciding a motion to modify, courts should examine whether intervening changes have eliminated the need for the order and not the "correctness of the existing decree at the time it was entered"). Courts are empowered to order a temporary receivership and asset freeze to maintain the status quo during a pending case deciding rule violations like the TSR and ROSCA, and *AMG* did not disturb that authority. *FTC v. Apex Capital Grp.*, CV 18-9573-JFW(JPRx), 2022 WL 1060486, at *3 (C.D. Cal. Mar. 10, 2022) (unpublished). Thus, even if the Court modified the Stipulated Judgments in this case to preclude the Receiver from seeking to recover monetary damages under Section 13(b), the Receiver could still pursue damages under Section 19 and ROSCA and the state law

---

[68] Based on data in Elite IT's customer relations management (CRM) database, the net receipts from May 25, 2016, through the date of filing were $9,474,225.12. PX53, ¶ 8.

[69] Defendants, ignoring that they agreed to a judgment amount equal to their receipts while enjoying a suspension based on their ability to pay, now claim that to recover under Section 19, the FTC must prove individual consumers relied on Defendants' misrepresentations. However, under *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993), there is a presumption of reliance where—as here—Defendants "made material misrepresentations, that they were widely disseminated, and … consumers purchased the defendant's product." *Id.* at 605-06. Moreover, the appropriate measure of redress under Section 19 where goods are sold directly to defrauded consumers is a defendant's revenues. *See FTC v. QYK Brands LLC*, No. SACV 20-1431 PSG (KESx) (C.D. Cal. Apr. 6, 2022) (unpublished), slip op. at 12-13, **Attachment A** ("Simply because the value of refunds to consumers is … equal to Defendants' total … revenue does not transform otherwise permissible refunds into impermissible disgorgement.").

claims.").

The receivership and asset freeze provisions of the TRO and Stipulated Preliminary Injunction in this case were authorized under Section 13(b) as they were necessary to preserve the status quo and the Court's ability to grant complete and permanent relief—including monetary relief for Defendants' violations of the TSR and ROSCA under Section 19. *See, e.g.*, *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 717-18 (1982) (The Federal Trade Commission is authorized to petition a district court for preliminary injunctive relief under 13(b) and in the exercise of this inherent equitable jurisdiction the district court may order temporary, ancillary relief preventing dissipation of assets or funds that may constitute part of the relief eventually ordered in the case).[70] Indeed, Defendant Martinos proved that the asset freeze and receivership were necessary when he violated the TRO by removing and modifying hard drives containing incriminating evidence against him. ECF 81 at 16-18. Absent the Receiver's scrutiny and control of the premises, Defendant Martinos would have had ample opportunity to secretly modify evidence and move assets outside the reach of the Court.

## <u>CONCLUSION</u>

For the foregoing reasons, the FTC respectfully requests that, in the interests of equity and justice, the Court deny Defendants' motion to vacate the Stipulated Final Judgment.

---

[70] ECF 9 at 33-37 (TRO Mot. at 29-32); ECF 15 at 2-3 (TRO at 2-3); ECF 81 at 22-24 (Reply in Supp. of PI at 16-18).

Dated:  April 14, 2022          Respectfully Submitted,

/s/ *Colleen Robbins*

Amanda R. Grier
Colleen B. Robbins
Elsie B. Kappler
Federal Trade Commission
600 Pennsylvania Ave., N.W., CC-8528
Washington, DC  20580
(202) 326-3745 (Grier)
(202) 326-2548 (Robbins)
(202) 326-2466 (Kappler)
agrier@ftc.gov
crobbins@ftc.gov
ekappler@ftc.gov
*Attorneys for the Plaintiff Federal Trade Commission*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 14, 2022, I electronically filed the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO VACATE THE JUDGMENT PURSUANT TO RULE 60(B) AND MEMORANDUM IN SUPPORT** with the Clerk of the Court using CM/ECF, which will send a notice of electronic filing to counsel of record.

/s/ *Colleen Robbins*
Colleen Robbins

# Attachment A

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

Present: The Honorable    Philip S. Gutierrez, United States District Judge

| Wendy Hernandez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
| Not Present | Not Present |

**Proceedings (In Chambers):**    **Order GRANTING the FTC's motion for summary judgment and DENYING Defendants' motion for partial summary judgment**

Before the Court are two motions for summary judgment. Plaintiff, the Federal Trade Commission ("FTC"), filed a motion for summary judgment. *See generally* Dkt. # 168 ("*Mot. I*"). Defendants QYK Brands LLC d/b/a Glowyy ("QYK"); DRJSNATURAL LLC ("Dr. J's Natural"); Rakesh Tammabattula ("Tammabattula"); Jacqueline Thao Nguyen a/k/a Dr. J ("Dr. J"); EASII, Inc. ("EASII"); and Theo Pharmaceuticals, Inc. ("Theo") (collectively, "Defendants") opposed.[1] *See generally* Dkt. # 198 ("*Opp. I*"). The FTC replied.[2] *See generally*

---

[1] The FTC and Defendants both filed motions to exceed the 25-page limit set by the Local Rules. *See generally* Dkts. # 134, 197. The length of the briefing is unsurprising given the voluminous and unfiltered state of the FTC's supporting evidence. But because neither motion to exceed the page limit was opposed, the Court **GRANTS** both motions and accepts as filed both the FTC's motion and Defendants' opposition.

[2] The FTC also filed a 25-page reply. It subsequently realized that the Court's Standing Order requires reply briefs not to exceed 12 pages and so applied ex parte to exceed the page limit after the fact. *See generally* Dkt. # 207. Defendants opposed, arguing that the FTC does not meet the ex parte standard, does not establish good cause for the extra page limit, prejudices Defendants by raising new arguments for the first time in the reply, and should be sanctioned. *See generally* Dkt. # 208. True, the FTC does not meet the traditional *Mission Power* test for ex parte relief, but the test also permits relief where, as here, the movant is guilty of only excusable neglect. *See Mission Power Eng'g Co. v. Continental Cas. Co.*, 883 F. Supp. 488, 493 (C.D. Cal. 1995). Because the Court has already permitted the parties to exceed the page limit in their other briefs, there is no reason to disregard a majority of the FTC's reply at this point. And the Court fails to see how Defendants would be prejudiced by the extra pages simply because they allegedly raise

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

Dkt. # 205 ("*Reply I*"). Defendants also filed a motion for partial summary judgment. *See generally* Dkt. # 196 ("*Mot. II*"). The FTC opposed. *See generally* Dkt. # 196 ("*Opp. II*"). Defendants replied. *See generally* Dkt. # 203 ("*Reply II*").

The Court finds these matters appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. Having considered the moving, opposing, and reply papers, the Court **GRANTS** the FTC's motion for summary judgment and **DENIES** Defendants' motion for partial summary judgment.

I.     Background

This case concerns the sale of hand sanitizer and other health products that were in high demand at the outset of the COVID-19 pandemic. Defendants view themselves as heroes who worked around the clock to meet the needs of the American public during a global pandemic. *Opp. I* 1:2–20. The FTC views things differently, accusing Defendants of deceiving a frenzied public by soliciting orders for hand sanitizer that they neither had in stock nor could timely ship and claiming without support that a protein powder product could protect users from COVID-19. *Mot. I* 1:3–2:19.

A.     Hand Sanitizer Sales

The facts are largely undisputed. Tammabattula and Dr. J own and operate several businesses, including QYK, Dr. J's Natural, Theo, and EASII. *Plaintiff's Statement of Undisputed Facts*, Dkt. # 136 ("*PSUF*"), ¶¶ 10, 13, 26–31, 35, 38. Tammabattula and Dr. J run these businesses as a tight-knit, joint enterprise that shares employees and office locations.[3] *Id.* ¶¶ 40–42.

---

new arguments for the first time. As the Court previously explained to Defendants when they tried to raise a new argument in a reply brief, such arguments generally will not be considered even if made within the page limit. *See* Dkt. # 127 at 1 n.1 (citing *FT Travel-N.Y., LLC v. Your Travel Ctr., Inc.*, 112 F. Supp. 3d 1063, 1079 (C.D. Cal. 2015)). Accordingly, the Court **GRANTS** the FTC's ex parte application, accepts the reply brief as filed, and **DENIES** Defendants' request for sanctions.

[3] As such, the parties have stipulated that the corporate Defendants are a "common enterprise" and that each is jointly and severally liable for the actions of the others. *See* Dkt. # 164, ¶¶ 16–17.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

In March 2020, to meet a pandemic-driven swell in demand for disinfectants, Defendants began offering various hand sanitizer products on their Glowwy and Dr. J's Natural websites.  *Id.* ¶¶ 52–53, 55–57.  Defendants attracted customers by launching a "Google AdWords" campaign that would return an advertisement, similar to the one pictured below, in response to a web search for terms like "human coronavirus" or "hand sanitizer in stock."  *Id.* ¶¶ 63–64.  Defendants also ran other online advertisement campaigns on platforms like Facebook, Instagram, Reddit, and Bing.  *Id.* ¶¶ 66–68, 265.



Between March 4 and March 18 alone, Defendants sold nearly 150,000 bottles of hand sanitizer.  *Id.* ¶ 80.  And between March and August 2020, Defendants' hand sanitizer sales totaled over $3.3 million.  *Id.* ¶¶ 279, 391.  The FTC attributes this sales boom in part to Defendants' fast shipping promises.  For example, one Google advertisement that was live from March 4 to 18 prominently stated, "Hand Sanitizers in Stock" and "Ships Today."  *Id.* ¶¶ 64, 77.  And another Google advertisement that ran from April to mid-May 2020 boasted that hand sanitizer "Ships Fast from CA Today."  *Id.* ¶ 191.  It is unclear what, if any, shipping promises Defendants' advertisements on other platforms made.  But between March and May 2020, Defendants' websites offered shipping times between three to ten days.  *Id.* ¶¶ 171–77.

Defendants did not always follow through on their shipping promises.  Of the 43,633 orders Defendants received between March and August 2020, the FTC claims that 39,724 were shipped late.  *Id.* ¶ 390.  This figure assumes that all sales made between March 4 to 18 and April 1 to May 18 promised one-day shipping, while orders placed between March 19 to 31 and May 19 to December 29 promised ten-day shipping.  *Id.*  But this assumption is not entirely supported by the record, as the FTC's only evidence of one-day shipping promises comes from Defendants' Google AdWords advertisements, which accounted for only 10 to 11% of Defendants' total hand sanitizer sales.  *See* Dkt. # 199-3, Ex. C.  In any event, it is undisputed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

that over 30,000 orders took more than 10 days to ship for orders placed between March and May 2020, *id.* ¶ 179, and over 10,000 orders took more than 30 days to ship, *id.* ¶ 394.[4]

The FTC avers that shipping was delayed in part because Defendants' inventory was woefully insufficient to meet demand. Throughout March and April 2020, Tammabattula publicly announced that Defendants lacked ingredients and packaging to keep up with demand. *PSUF* ¶¶ 331–33, 341–51. For example, from March 4 to 9, Defendants sold over 18,000 bottles of hand sanitizer but did not receive any stock from suppliers during that time. *Id.* ¶¶ 113–14. To be sure, Defendants tried to restock their inventory. *See id.* ¶ 116. But in early March 2020, India banned hand sanitizer exports, blocking important supply shipments from two producers. *Id.* ¶¶ 126–27. So Defendants turned their attention to China, ordering several thousand bottles of hand sanitizer that ultimately did not arrive until almost a week into Defendants' advertisement campaign. *Id.* ¶¶ 128–30. Despite known supply chain obstacles and a dwindling or nonexistent inventory, Defendants did not always indicate on their websites when products were sold out, *id.* ¶ 121, and instead continued to sell products that they did not have with the hope that their suppliers would deliver more inventory soon, *see DRPSUF* ¶ 121.

Defendants did not regularly notify their customers of the resulting shipping delays. On March 11, Defendants sent customers an "order processing time update," citing "longer than normal processing times" for "outbreak preparedness products." Dkt. # 162, Ex. 16, Att. W. Defendants stated that, "[i]f this delay is not acceptable, you may cancel your order for a full refund anytime before we ship." *Id.* But unless consumers contacted Defendants' customer service team, Defendants provided no other notice of shipping delays. *See PSUF* ¶ 214; *DRPSUF* ¶ 214.

Some customers voiced their dissatisfaction with the shipping delays and demanded refunds. *See PSUF* ¶¶ 258, 381. Defendants' return policy generally permitted customers to request a refund while the product was still in the "preshipment" stage—i.e., before it had been placed in the mail carrier's possession. *Id.* ¶ 245. But at times, Defendants refused to issue

---

[4] Defendants argue that this figure is not accurate because postal workers would not always scan an order indicating that it had been picked up—i.e., shipped—until days after they actually picked it up. *See Defendants' Response to Plaintiff's Statement of Undisputed Facts*, Dkt. # 202 ("*DRPSUF*"), ¶ 394 (citing *Declaration of Rakesh Tammabattula*, Dkt. # 199 ("*Tammabattula Decl.*"), ¶ 34). But Tammabattula's speculative statements in declaration—unsupported by any actual evidence—are insufficient to create a genuine factual dispute. *See Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

refunds once a shipping label had been generated and instead required customers to wait to receive the package and then reject it before receiving a refund. *See* Dkt. # 162, Ex. 16, Att. X, at 1 ("We can[']t cancel because it is already labelled. Your order will be scheduled for shipping within the week or early next week.").

### B. Protein Powder as a COVID-19 Preventative

Defendants also sold a product called "Basic Immune IGG" that they offered through the Dr. J's Natural website. *PSUF* ¶¶ 280–81. Basic Immune IGG is a protein powder that is supposed to promote healthy digestion and immune function. *Id.* ¶¶ 286–87. It is not FDA-approved to treat or prevent COVID-19. *Id.* ¶ 309. During a Vietnamese language broadcast, Dr. J encouraged people to wash their hands regularly and use Basic Immune IGG. As a result, she "guaranteed" that people would "stay safe," citing the product's "FDA[] verification and approval." Dkt. # 144, Ex. 8, Att. A, at 14–15. She went on to explain that the protein powder could increase the user's total antibody count, giving them a better chance to "cling to and bite that coronavirus, push it out and kill it." *Id.* at 15. The broadcast host then said that, since Dr. J had taken the protein powder already, people "d[id not] have to be afraid of [her] anymore" and that people "c[ould] get close to [her]." *Id.* Dr. J confirmed: "Yes, you're right." *Id.* Dr. J also posted two English language videos on YouTube that made similar claims but with more muted language. *See PSUF* ¶¶ 299–308; Dkt. # 137-1, Ex. 1, Att. H, at 11 (explaining that Basic Immune IGG could help users "fight back and destroy all of the coronavirus that is entering into your body").

### C. Procedural History

In August 2020, the FTC filed a complaint and an ex parte application for a temporary restraining order against Defendants. *See generally* Dkts. # 1, 6. The parties then stipulated to, and the Court approved, both a temporary restraining order and a preliminary injunction. *See generally* Dkts. # 28, 30. The FTC's operative first amended complaint asserts four claims:

> Count One – Failure to Timely Ship Goods and Issue Refunds:
> Violation of the Mail, Internet, or Telephone Order Merchandise
> Rule ("MITOR"), 16 C.F.R. § 435.2(a)–(c). *First Amended
> Complaint*, Dkt. # 73 ("*FAC*"), ¶¶ 72–73.

> Count Two – Deceptive Shipping Claims: Violation of § 5 of the
> FTC Act, 15 U.S.C. §§ 45(a), 52. *FAC* ¶¶ 77–79.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

> Count Three – Deceptive COVID-19 Prevention Claims: Violation
> of § 5 of the FTC Act, 15 U.S.C. §§ 45(a), 52. *FAC* ¶¶ 80–82.

> Count Four – False Establishment Claims: Violation of § 5 of the
> FTC Act, 15 U.S.C. §§ 45(a), 52. *FAC* ¶¶ 83–85.

The FTC now moves for summary judgment on each of its four claims, seeking monetary relief for consumers and a permanent injunction. *See generally Mot. I.* Defendants also move for partial summary judgment to bar the FTC from seeking what Defendants classify as a punitive disgorgement remedy. *See generally Mot. II.*

## II. Legal Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all reasonable inferences in the light most favorable to the nonmoving party. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be capable of being presented at trial in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co.*, 594 F.2d at 738.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

III.   Evidentiary Objections

The FTC asserts various evidentiary objections along with its reply. *See generally* Dkt. # 206. If the Court relies on any objected-to evidence, it relies only on admissible evidence and thus overrules the corresponding objection. *See Godinez v. Alta-Dena Certified Dairy LLC*, No. CV 15-01652 RSWL (SSx), 2016 WL 6915509, at *3 (C.D. Cal. Jan. 29, 2016).

IV.   Discussion

The Court first addresses whether the FTC has carried its burden of proof as Plaintiff at summary judgment to prevail on its (A) MITOR claim and (B) FTC Act claims. The Court then turns to (C) the remedies the FTC is entitled to seek.

A.   First Cause of Action: MITOR Violation

The FTC argues Defendants violated the MITOR for several reasons, namely by soliciting hand sanitizer orders without a reasonable basis to believe they could ship the orders as promised. *Mot. I* 26:3–35:13. The Court agrees.

The MITOR proscribes three distinct practices relating to shipping merchandise and refunding consumers. *See* 16 C.F.R. § 435.2. First, a seller may not solicit orders for merchandise "unless, at the time of the solicitation, the seller has a reasonable basis to expect that it will be able to ship any ordered merchandise to the buyer." *Id.* § 435.2(a). Shipment must be either within the time "clearly and conspicuously stated" in the solicitation or, if no time is specified, within 30 days after a buyer's order. *Id.* § 435.2(a)(i)–(ii). Shipment means physically placing the merchandise "in the possession of the carrier." *Id.* § 435.1(e). Second, if the seller cannot ship within these timeframes, the seller must offer the buyer, "clearly and conspicuously and without prior demand," the option to either consent to delayed shipping or cancel the order and receive a "prompt refund." *Id.* § 435.2(b)(1). Third, sellers must issue a prompt refund if, (1) prior to shipment, the buyer cancels the order; or (2) the seller fails to offer the buyer the option to consent to the delay and has not timely shipped the goods. *Id.* § 435.2(c)(1), (5).

Defendants' hand sanitizer sales between March and August 2020 violated all three of the MITOR's proscribed practices. First, Defendants solicited orders for hand sanitizer that they did not have in stock and had no "reasonable basis" to believe would be available to ship on Defendants' advertised timelines. *See id.* § 435.2(a). Throughout March and April 2020, Tammabattula publicly acknowledged that Defendants lacked ingredients and packaging to keep

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|----------|-------------------------|------|---------------|
| Title | FTC v. QYK Brands LLC, et al. | | |

up with demand. *PSUF* ¶¶ 331–33, 341–51. And Defendants knew that the COVID-19 pandemic had disrupted the global supply chain, resulting in delayed—sometimes indefinitely—shipments that they needed to meet an ever-growing demand for hand sanitizer. *Id.* ¶¶ 113–14, 126–30. This strongly suggests that Defendants had no "reasonable basis" to continue offering one to ten-day shipping or indicating that hand sanitizer was still in stock on their website. *See* 16 C.F.R. § 435.2(a). Additionally, over 10,000 orders took longer than 30 days to ship. *PSUF* ¶ 394. At bottom, these orders ran afoul of the MITOR because they exceeded both the "clearly and conspicuously stated" shipping timelines in some of Defendants' advertising as well as the MITOR's maximum 30-day shipping timeline when no specific shipping speed is stated. *See* 16 C.F.R. § 435.2(a)(i)–(ii).

Second, Defendants failed to "clearly and conspicuously and without prior demand" give consumers the option either to consent to delayed shipping or to cancel their orders and receive a refund. *Id.* § 435.2(b)(1). On only one occasion in March 2020, Defendants notified consumers that orders were taking longer than expected to process and offered refunds if orders had not yet shipped. *See PSUF* ¶¶ 210–11; Dkt. # 162, Ex. 16, Att. W. But Defendants provided no other notice of shipping delays unless customers contacted Defendants' customer service team. *PSUF* ¶ 214; *DRPSUF* ¶ 214. In other words, any other notice of shipping delays was not offered "without prior demand." *See* 16 C.F.R. § 435.2(b)(1).

Third, Defendants did not always issue refunds—much less "prompt" refunds—when customers requested one before their order had shipped. *See, e.g.*, Dkt. # 162, Ex.1 16, Att. X, at 1 ("We can[']t cancel because it is already labelled. Your order will be scheduled for shipping within the week or early next week.").

Accordingly, the FTC's undisputed evidence reveals that Defendants violated multiple provisions of the MITOR between March and August 2020.[5] As such, the Court **GRANTS** the FTC's motion for summary judgment as to its first cause of action.

---

[5] Additionally, because this action is brought by the FTC, Defendants' failure to maintain adequate records indicating when shipments were actually placed in the mail carrier's possession, *PSUF* ¶¶ 153, 207, 406, yields a rebuttable—and, here, unrebutted—presumption that Defendants violated the MITOR, *see* 16 C.F.R. § 435.2(a)(4).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

B.   <u>Second, Third, and Fourth Causes of Action: FTC Act Violations</u>

The FTC claims it is entitled to summary judgment on its three FTC Act causes of action. *Mot. I* 35:14–39:19.  The Court agrees.

The FTC Act prohibits, among other things, "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  A statement can be "unfair or deceptive" if it is likely to mislead reasonable consumers under the circumstances in a way that is "material."  *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001).  Whether a statement is misleading may be based on the "net impression" it creates or the "failure to disclose material information."  *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006); *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1154 (9th Cir. 1984).  A misleading statement is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."  *Cyberspace.com LLC*, 453 F.3d at 1201 (quoting *Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (1984)).  Materiality is presumed when statements "significantly involve health, safety, or other issues that would concern reasonable consumers."  *FTC v. Wellness Support Network, Inc.*, No. 10-CV-04879-JCS, 2014 WL 644749, at *17 (N.D. Cal. Feb. 19, 2014).

Here, Defendants' shipping speed and "in stock" representations were "unfair or deceptive" and thus in violation of the FTC Act.  Defendants advertised shipping speeds ranging anywhere from one day on Google to as many as ten days on their websites.  *PSUF* ¶¶ 64, 77, 171–77.  When Defendants made some of these shipping claims, they had already publicly acknowledged that they lacked ingredients and packaging to keep up with demand and faced obstacles in the supply chain that delayed shipments necessary to restock their inventory.  *Id.* ¶¶ 126–27, 128–30, 331–33, 341–51.  Yet Defendants continued to accept orders from customers, representing either implicitly or explicitly that they had hand sanitizer in stock and could ship it.  *See id.* ¶¶ 113–14, 121.  Such representations were also material because, as Defendants' former marketing director testified, at least some customers' decisions to order hand sanitizer turned on whether the product was actually in stock.  *See Deposition Transcript of Danielle Paulo*, Dkt. # 161, Ex. 16, Att. U ("*Paulo Depo.*"), at 88:9–19 ("So I think it really shocked everybody else in the U.S. that we even had them, so [customers] just wanted to confirm first that we had them in stock.  And when we did confirm that, they would place their order.").

Defendants' representations that Basic Immune IGG protein powder could protect users from COVID-19 and that it was FDA approved for that purpose were also "unfair or deceptive" and thus in violation of the FTC Act.  Dr. J represented in both Vietnamese and English

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|----------|--------------------------|------|----------------|

| Title | FTC v. QYK Brands LLC, et al. |
|-------|-------------------------------|

language broadcasts that Basic Immune IGG could help users strengthen their immune system
and thus "cling to and bite that coronavirus, push it out and kill it" or "fight back and destroy all
of the coronavirus that is entering your body." Dkt. # 144, Ex. 8, Att. A, at 15; Dkt. # 137-1, Ex.
1, Att. H, at 11. Defendants argue that, when viewed in context with the entire video, these
representations were not misleading. *See Opp. I* 22:6–25:11. Viewed in the light most favorable
to Defendants, the Court agrees that Dr. J's statements could be reasonably interpreted to mean
only that Basic Immune IGG helps boost users' immune systems, which is exactly what the
product was designed to do. *See PSUF* ¶¶ 286–87.

But Dr. J went much further than that. In a Vietnamese language broadcast, Dr. J
represented that, by taking Basic Immune IGG, people did not have to be afraid to stand close to
her anymore. Dkt. # 144, Ex. 8, Att. A, at 14–15. And she "guaranteed" that users would "stay
safe" if they washed their hands and used Basic Immune IGG, citing the product's "FDA[]
verification and approval."[6] *Id.* To be sure, Dr. J did not say that users would "stay safe" from
COVID-19 specifically or that Basic Immune IGG was FDA approved to protect against
COVID-19. But even when read in the light most favorable to Defendants and in context with
the entire broadcast, the clear "net impression" was that Dr. J misleadingly implied that Basic
Immune IGG users would stay safe from COVID-19 and that it was FDA approved for that
purpose. *See Cyberspace.com LLC*, 453 F.3d at 1200; *Sterling Drug, Inc.*, 741 F.2d at 1154.
These misleading statements were also material because they "significantly involve[d] health,
safety, or other issues that would concern reasonable consumers." *Wellness Support Network,
Inc.*, 2014 WL 644749, at *17.

Accordingly, the FTC has established that Defendants violated the FTC Act by making
materially misleading statements about (1) their hand sanitizer stock and shipping capabilities,
(2) Basic Immune IGG's ability to prevent COVID-19 infection and transmission, and (3) Basic
Immune IGG's FDA approval. As such, the Court **GRANTS** the FTC's summary judgment
motion as to their second, third, and fourth causes of action.

---

[6] Defendants challenge the accuracy of the FTC's certified translation of these statements. *See*
Dkt. # 200, ¶¶ 16–18. But Dr. J's own alternative translation of the same passage is not enough
to create a genuine factual dispute because she does not even attempt to establish her
competence to testify as a Vietnamese to English translator. *See* Fed. R. Civ. P. 56(c)(4).
Absent a properly authenticated alternative translation, it is well established that the non-moving
party cannot manufacture a genuine factual dispute with conclusory statements in a declaration.
*See Thornhill Publ'g Co.*, 594 F.2d at 738.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

C. <u>Remedies</u>

The FTC seeks both (i) monetary relief for consumers and (ii) a permanent injunction. The FTC also requests that (iii) the individual Defendants—Tammabattula and Dr. J—be held personally liable for their companies' violations. *Mot. I* 39:20–50:5. The Court addresses each issue in turn.

i.    *Monetary Relief for Consumers*

The FTC seeks over $3 million in refunds for consumers—i.e., Defendants' net revenue, minus any already issued refunds, from March to August 2020. *Mot. I* 42:11–14. Defendants separately filed a motion for partial summary judgment, arguing that the FTC should take nothing without showing that shipping delays actually injured consumers, and if injury is established, that the Court should limit the monetary relief to Defendants' net profits, not their net revenue. *Mot. II* 13:5–18.

Section 19 of the FTC Act permits the FTC to seek monetary relief "necessary to redress injury to consumers" resulting from any rule violation—i.e., the MITOR. *See* 15 U.S.C. § 57b(b). The FTC must establish consumer injury but need not prove individual reliance to do so. *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) (per curiam) ("[P]roof of individual reliance by each purchasing consumer is not needed."); *accord United States v. MyLife.com, Inc.*, __ F. Supp. 3d. __, No. CV 20-6692 JFW (PDx), 2021 WL 4891776, at *13 (C.D. Cal. Oct. 19, 2021). Instead, if the FTC demonstrates that a defendant made material representations that were widely disseminated, there is a presumption of actual reliance. *Figgie Int'l, Inc.*, 994 F.2d at 605–06; *see also id.* at 606 ("The same reasoning is applicable to Section 19."). Unless the defendant can rebut that presumption, injury to consumers is decisively established. *Id.* at 606.

Defendants rely on an Arizona district court case for the proposition that the FTC cannot seek redress for shipping delays under the MITOR without proving individual consumer injury. *See Mot. II* 5:12–10:20. In *FTC v. Noland*, the court addressed a MITOR violation for late-shipped products. No. CV-20-00047-PHX-DWL, 2021 WL 5493443, at *3 (D. Ariz. Nov. 23, 2021). The district court held that the FTC was not entitled to the refunds it requested because it failed to carry its burden of proof at summary judgment of demonstrating that customers were actually injured by the shipping delays. *Id.* However, the court reached this conclusion without addressing whether the FTC was entitled to a presumption of reliance that, if applicable, would have overcome any concerns with individual injury. *See id.* at *3–4. This is presumably because

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

the FTC's MITOR theory was based on violations that arose only *after* the contract was consummated. *See* 16 C.F.R. § 435.2(b)–(c).

*Noland*'s concerns with consumer injury do not readily translate here. Critically, the FTC has established a MITOR violation for conduct that occurred *before* any contract was consummated. *See* 16 C.F.R. § 635.2(a) (solicitation of merchandise orders is prohibited "unless, *at the time of the solicitation*, the seller has a reasonable basis to expect that it will be able to ship any ordered merchandise to the buyer" within the timeframe "clearly and conspicuously" stated (emphasis added)). Accordingly, because the FTC's theory of MITOR liability here turns on Defendants' pre-purchase, materially misleading shipping promises, the presumption of actual reliance standard can apply here. *See Figgie Int'l, Inc.*, 994 F.2d at 605. And given Defendants' widely disseminated materially misleading claims that they had hand sanitizer in stock and ready to ship, the Court finds that the FTC is entitled to a presumption of actual reliance in this case. *See id.* Because Defendants have "presented no evidence to rebut the presumption of reliance, injury to consumers has been established." *Id.* at 606.

Once consumer injury is established, the FTC Act permits monetary relief "necessary to redress" that injury, including refunds and damages. *See* 15 U.S.C. § 57b(b). Defendants propose that the Court follow a "net profit" redress approach described in *Figgie*. *See Mot. II* 11:17–12:13. There, the Ninth Circuit approved, with some modification, the district court's monetary redress model. *Figgie, Int'l, Inc.*, 994 F.2d at 609. The court upheld the portion of the plan requiring the defendant to pay its net profits during the relevant time period into an escrow account managed by the FTC. *Id.* at 605. Customers could then make claims for a full refund from the account. *Id.* Assuming that customer refund claims exceeded the defendant's net profits, the defendant was then required to add additional funds to the escrow account not to exceed its net revenue during the relevant time period. *Id.* at 608. The district court found this model necessary because the defendant sold its products to distributors for cash who then marked up the price at unknown rates and sold directly to consumers. *Id.* at 606. As such, the price customers actually paid for the product was uncertain and could be ascertained only by having customers make individual refund claims. *See id.*

Here, the Court does not find it necessary to implement the same recovery plan because Defendants sold products directly to consumers rather than through a distributor. As such, the refund due to each customer is clear from Defendants' records, and the appropriate measure of consumer redress is net revenues, not net profits. *See MyLife.com, Inc.*, __ F. Supp. 3d. at __, 2021 WL 4891776, at *13. Outside of the unique circumstances presented in *Figgie*, the Court sees no justification—and Defendants suggest none—for arbitrarily capping available refunds at

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

the Defendants' net profit. And, in any event, *Figgie* did not cap refunds at the defendant's net profits; it simply used that as a starting point, subject to increase depending on the volume of refund requests. *See* 994 F.2d at 608.

Defendants also claim that depriving them of their net revenue for hand sanitizer is an impermissible form of disgorgement. *Mot. II* 4:5–17. To be sure, the Ninth Circuit has held that disgorgement and other forms of punitive or exemplary damages are not authorized here. *See Figgie Int'l, Inc.*, 994 F.2d at 607. But the FTC does not seek disgorgement; it seeks refunds to customers explicitly authorized by the FTC Act. *See* 15 U.S.C. § 57b(b) ("Such relief may include . . . the refund of money or return of property."). Simply because the value of refunds due to consumers is—unsurprisingly—equal to Defendants' total hand sanitizer revenue does not transform otherwise permissible refunds into impermissible disgorgement.

Finally, Defendants argue that to be entitled to a refund, customers should be required to return the hand sanitizer or else they will receive a "windfall" by retaining their hand sanitizer and receiving a refund. *Reply II* 10:18–25. It does not follow that a refund exceeds necessary consumer redress simply because the product the consumer purchased has some value too. The Ninth Circuit rejected a similar argument in *Figgie*, explaining that the amount of redress due to a consumer need not be decreased by the fair market value of the product or service received. 994 F.2d at 606. To illustrate why, the Ninth Circuit raised the hypothetical case of a "dishonest rhinestone merchant" who sold customers diamonds that were in fact rhinestones. *Id.* The court explained that it "would not limit [customers'] recovery to the difference between what they paid and a fair price for rhinestones" because, had the customers known the truth, they might never have purchased rhinestones at all. *Id.* In other words, customers are not owed a refund because they received hand sanitizer that may or may not have been useful to them after Defendants' shipping delays; customers are owed a refund because Defendants' deception induced the sale in the first place. *See id.* ("The fraud in the selling, not the value of the thing sold, is what entitles customers in this case to full refunds or to refunds for each [product] that is not useful to them.").

In short, the Court agrees with the FTC that consumers are entitled to redress in the form of full refunds not to exceed Defendants' total hand sanitizer revenue from March to August 2020—i.e., $3,086,238.99. However, given that some customers may have been satisfied with their hand sanitizer orders—even if delayed—the Court prefers to implement a redress plan requiring customers to make refund requests rather than receiving the funds outright. *See Mot. II* 11:17–13:2; *Opp. II* 13:13 n.21. The FTC is to hold this sum in an escrow account, and Defendants' customers may seek refunds directly from the FTC. Funds must be returned to

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

Defendants, less the FTC's costs to administer the refund process, if they remain unclaimed 120 days after consumers are notified. *See Figgie Int'l, Inc.*, 994 F.2d at 607–08 (modifying the district court's plan to ensure that unclaimed funds be returned to the defendant, less the FTC's administration costs).

Accordingly, the Court **GRANTS** the FTC's requested monetary relief for consumers stemming from Defendants' violation of the MITOR and **DENIES** Defendants' motion for partial summary judgment that seeks to bar such relief.

### ii. *Permanent Injunctive Relief*

The FTC seeks a permanent injunction to prevent Defendants from advertising or selling "protective goods and services," including products designed or represented to detect, treat, prevent, mitigate, or cure COVID-19 or any other infection or disease. *Mot. I* 44:6–9; *see also Proposed Judgment*, Dkt. # 168-1, ¶ O. The FTC also seeks to implement various monitoring measures to ensure Defendants' compliance with the permanent injunction. *Mot. I* 46:11–20.

The FTC is authorized to seek a permanent injunction for violation of "any provision of law enforced by the" FTC. 15 U.S.C. § 53(b). Injunctive relief under this section "cannot be used to remedy past behavior and can only be granted where wrongdoing is ongoing or likely to recur." *FTC v. Cardiff*, No. EDCV 18-2104 DMG (PLAx), 2021 WL 3616071, at *7 (C.D. Cal. June 29, 2021). To determine whether wrongdoing is likely to recur, courts consider several factors, including "[1] the degree of scienter, [2] frequency of violative acts, [3] the defendant's ability to commit future violations, [4] the degree of harm consumers suffered, and [5] the defendant's recognition of his own culpability." *United States v. Zaken Corp.*, 57 F. Supp. 3d 1233, 1242 (C.D. Cal. 2014). The scope of an injunction depends on the circumstances of each case but must bear "a reasonable relationship to the violation." *FTC v. John Beck Amazing Profits LLC*, 888 F. Supp. 2d 1006, 1012 (C.D. Cal. 2012).

Based on the factors outlined above, the FTC is entitled to the permanent injunction it seeks. First, Defendants had a high degree of scienter. Regarding hand sanitizer sales, Tammabattula publicly acknowledged that Defendants lacked supplies to keep up with demand. *PSUF* ¶¶ 331–33, 341–51. Yet Defendants continued to solicit orders from customers when they had insufficient sanitizer inventory on hand and were well aware of the global supply chain disruptions that hindered Defendants' ability to restock their inventory. *See id.* ¶¶ 113–14, 121, 126–27. Additionally, Defendants had at least some notice that their advertisements were problematic because their Google advertising account was suspended for "potentially profit[ing]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

from or exploit[ing]a sensitive event with significant social, cultural or political impact." *Id.* ¶¶ 189–94. Defendants' Facebook account suffered a similar fate, but Defendants sought out a freelancer to advertise for them to circumvent the suspension. *Id.* ¶¶ 436–38. Turning to Basic Immune IGG sales, Dr. J is a licensed pharmacist who had her pharmacy license suspended for "Unprofessional Conduct Involving Acts of Dishonesty, Fraud, or Deceit," among other things. *Id.* ¶¶ 20–23. Undeterred by this punishment, Dr. J nevertheless continued her apparent streak of dishonesty and deceit by misrepresenting on a Vietnamese language broadcast that Basic Immune IGG could prevent—or at least minimize the risk of—COVID-19 infection and was FDA approved for that purpose. *See* Dkt. # 144, Ex. 8, Att. A, at 14–15. Based on the foregoing, Defendants have exhibited a high degree of scienter, and this factor weighs in favor of finding that wrongdoing is likely to recur. *See Zaken Corp.*, 57 F. Supp. 3d at 1242.

Second and third, there was a high frequency of violative hand sanitizer sales, and Defendants retain the ability to commit future violations. As discussed above, between March and August 2020 Defendants violated the FTC Act by repeatedly soliciting hand sanitizer orders when Defendants had insufficient inventory or none at all. *See PSUF* ¶¶ 126–27, 128–30, 331–33, 341–51. And Defendants still sell hand sanitizer, personal protective equipment like face masks, and dietary supplements. *Id.* ¶ 427. As such, Defendants retain the ability to commit future violations even though they recently changed their business model to sell directly to wholesale retailers instead of individual consumers. *See Tammabattula Decl.* ¶ 42. Accordingly, the second and third factors weigh in favor of finding that wrongdoing is likely to recur.

Fourth, neither party explicitly addresses the relative degree of harm to consumers. Accordingly, this factor is neutral.

Fifth, Defendants have shown no recognition of their own culpability. They dispute that any wrongdoing took place. *See Tammabattula Decl.* ¶ 26 (blaming delays on the "unforeseen and unprecedented" COVID-19 pandemic); *id.* ¶ 33 (everyone received the hand sanitizer they ordered or received a refund); *id.* ¶ 46 (not aware of the law); Dkt. # 200, ¶¶ 16–18 (Dr. J disputing that she ever said Basic Immune IGG could ward off COVID-19 infection and was FDA approved for that purpose). Accordingly, this factor weighs in favor of finding that wrongdoing is likely to recur.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 20-1431 PSG (KESx) | Date | April 6, 2022 |
|---|---|---|---|
| Title | FTC v. QYK Brands LLC, et al. | | |

In sum, the foregoing factors support the conclusion that Defendants' wrongdoing is likely to recur. *See Cardiff*, 2021 WL 3616071, at *7. Accordingly, the Court **GRANTS** the FTC's requested permanent injunction and its associated compliance-monitoring measures.[7]

> ### iii. *Liability for Individual Defendants*

The FTC claims that the individual defendants—Tammabattula and Dr. J—should also be held personally liable for both the monetary and injunctive relief it seeks. *Mot. I* 47:1–50:5. Defendants do not dispute this in their opposition, so the Court deems the issue conceded. *See Tapia*, 2015 WL 4650066, at *2.

## V.    Conclusion

For the foregoing reasons, the Court **GRANTS** the FTC's motion for summary judgment and **DENIES** Defendants' motion for partial summary judgment. The FTC is **ORDERED** to file a revised proposed judgment consistent with this order no later than **April 22, 2022**.

Additionally, the Court **DENIES AS MOOT** the FTC's pending motion to strike Defendants' jury demand, as well as the parties' subsequent stipulation to strike the jury demand. *See generally* Dkts. # 192, 210.

**IT IS SO ORDERED.**

---

[7] Defendants do not address or otherwise dispute the injunction's proposed compliance monitoring measures, so the Court deems that issue conceded. *See Tapia v. Wells Fargo Bank, N.A.*, No. CV 15-03922 DDP (AJWx), 2015 WL 4650066, at *2 (C.D. Cal. Aug. 4, 2015) (arguments to which no response is supplied are deemed conceded).